**DeRANCE, INC., a Wisconsin not for profit corporation, Plaintiff–Appellee,**

v.

**PAINEWEBBER INCORPORATED, a Delaware corporation, and Paul Sarnoff, Defendants–Appellants.**

**No. 86–2666.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 16, 1987.

Decided April 24, 1989.

As Amended on Denial of Rehearing and Rehearing En Banc June 19, 1989.

Jerold S. Solovy, Jenner & Block, Chicago, Ill., for defendants-appellants.

Jerrold E. Salzman, Freeman & Salzman, P.C., Chicago, Ill., for plaintiff-appellee.

Before EASTERBROOK, RIPPLE, and MANION, Circuit Judges.

MANION, Circuit Judge.

Plaintiff DeRance, Inc. (DeRance), a not-for-profit charitable foundation, contracted with PaineWebber Incorporated (PaineWebber) and its agent Paul Sarnoff to trade a gold futures account on its behalf. Gold dropped and so did the account. DeRance sued and a jury awarded DeRance $7.7 million in compensatory damages and assessed more than $20 million in punitive damages. Defendants appeal from the district court's decision denying their motion for judgment n.o.v. or, in the alternative, for a new trial. Defendants contend that the trial was unfair because the district court erroneously precluded discovery, excluded evidence, misinstructed the jury, and permitted DeRance's counsel to make inflammatory arguments. After reviewing the entire record, we remit the punitive damages award against PaineWebber to $7 million. We otherwise affirm the district court's decision.

## I. NATURE OF THE CASE [1]

### A. Parties and Principals

DeRance is a Wisconsin charitable foundation. In the early part of this decade, DeRance had assets of almost $200 million. DeRance's Board of Directors consisted of Harry John, who started DeRance with shares of Miller Brewing Company stock he had inherited, Erica John, then John's wife but since divorced, and Dr. Donald Gallagher, a former philosophy professor. Harry John controlled DeRance's investments.

Sarnoff is a vice-president of PaineWebber. PaineWebber is registered as a fu-

---

**1.** The following summarizes the facts as read in the light most favorable to DeRance. We will add on other facts as needed to analyze PaineWebber's claims on appeal.

tures commission merchant with the Commodity Futures Trading Commission. PaineWebber is a subsidiary of PaineWebber Group, Inc. PaineWebber Group, Inc. is not a party to this lawsuit.

### B. DeRance Investment With PaineWebber

In late 1981, after reading an article about Sarnoff in a magazine, John called Sarnoff, then working for another company, and told him that he wanted to invest in gold. After moving to PaineWebber, Sarnoff called John in July, 1982, and suggested to him that the time was right to invest in commodity futures.[2] To win the account, Sarnoff boasted that he knew more about gold trading than anyone else in the country, and, according to notes John made in his business journal, that Sarnoff's trading "will provide us regular income." Sarnoff also told John about "all the diverse commodities he invested in, the metals and the T-bills," even though Sarnoff had no experience in trading commodities. Sarnoff's assistant at PaineWebber told John Miller, DeRance's outside counsel, that Sarnoff had invested in gold for other institutional investors. In line with John's recommendation, DeRance's board decided on August 20, 1982, to establish its "F Fund" with PaineWebber. This separate fund was so named to complement its stock portfolio, held in DeRance's "E Fund" (which was not invested through PaineWebber), which contained approximately $150 million worth of common stock. In the fall of 1982, DeRance delivered approximately $8 million to PaineWebber to establish the F

Fund. PaineWebber put DeRance's money into treasury bills while the parties negotiated a trading agreement.

### C. The Trading Agreement

After several months of negotiations, DeRance entered into a Commodity Trading Advisor Agreement (Agreement) with Sarnoff and PaineWebber. The Agreement became effective February 23, 1983. The account would be a discretionary gold futures trading account with Sarnoff and PaineWebber serving as DeRance's trading advisor and broker. The Agreement stated in particular that "[t]he investment objective of DeRance is to acquire an inventory of physical gold bullion not in excess of 15,000 ounces and to earn premium money during the accumulation of such inventory." ¶ 3(a). Thus, the purpose of this account was not just to accumulate gold but to earn money by trading. In the Agreement, DeRance gave PaineWebber and Sarnoff "discretionary authority concerning ... the purchase of gold bullion, the purchase and sale of gold futures contracts, and the granting and purchase of options for the purchase and sale of gold futures" in accordance with the trading plan, which was signed by John and Sarnoff and attached to the Agreement. The trading plan in turn describes six separate trading strategies that the parties agreed were appropriate to DeRance's objectives. DeRance did not know, however, that PaineWebber's senior management was skeptical of Sarnoff's trading plan.[3]

The Agreement expressly sought to limit the amount of risk PaineWebber and Sar-

---

**2.** "The traditional futures contract is an agreement between a seller and a buyer that the seller (called a *short*) will deliver to the buyer (called a *long*), at a price agreed to when the contract is first entered, and the buyer will accept and pay for, a specified quantity and grade of an identified commodity during a defined period in the future." 1 P. Johnson & T. Hazen, *Commodities Regulation* § 1.03 at 10 (1989) (emphasis in original).

**3.** For example, on December 16, 1982, James Ryan, PaineWebber's Commodity Compliance Director, wrote in a memorandum to David Gams, the PaineWebber senior vice president responsible for its commodities division—with copies to Barry Buchsbaum, the senior vice

president responsible for stock options, Margaret Sandridge, commodity counsel, and Sarnoff—that he thought that Sarnoff's trading plan would generate an abnormal amount of commissions and "seems almost too good to be true." Ryan repeated his warnings in an internal memorandum of January 3, 1983 to James Muff, PaineWebber's Stock Options Compliance Director, and one of January 4, 1983 to Gams, with copies to Richard Ryder, PaineWebber's Associate General Counsel, Sandridge, Buchsbaum and Sarnoff—stating that "we may verbally be presenting these unbelievably one-sided figures to an apparently unsophisticated charitable foundation...."

noff could incur in trading the account by providing that PaineWebber could not:

(a) Write a gold call option on behalf of the Fund as grantor or enter a futures contract to sell gold unless the Fund has a sufficient inventory of gold to cover the call option and/or the futures contract except to the extent such obligation (or potential obligation) may be offset by a long futures contract or a put option held by the Fund.

(b) Write a put option on behalf of the Fund as grantor or enter a futures contract to buy gold unless the Fund has sufficient cash resources to cover the put option and/or the futures contract except to the extent such obligation (or potential obligation) may be offset by a short futures contract or a call option held by the Fund.

\* \* \* \* \* \*

(e) Acquire any gold futures contract, acquire any gold futures option contracts, write any gold futures option contracts on behalf of the Fund as grantor, purchase any gold bullion or make any other investment contrary to the provisions hereof or contrary to any written instruction given to [PaineWebber] by DeRance....

In addition, the Commodities Futures Trading Commission (CFTC) requires brokers to file a report when the number of open contracts in a commodity future that they hold exceeds a certain number set by regulation. 17 C.F.R. § 15.00(b) (1981). The Agreement required PaineWebber to notify DeRance when it obtained or held positions in gold futures and options that were in excess of those reportable limits, ¶ 2(f), and to provide DeRance with certain specific information on transactions during the time it holds a reportable position.

The Agreement further required PaineWebber to send DeRance "monthly reports in such form as may be mutually acceptable showing all transactions effected for the account of the F Fund." Paragraph 6(j)(iii) in turn required DeRance to review the transactions of the F Fund as reported in PaineWebber's statements and to advise PaineWebber promptly of any problems:

De Rance shall review reports and information provided to it by [PaineWebber] and shall advise [PaineWebber] promptly of any impermissible investment of the Fund of which De Rance has knowledge or which creates a likelihood of a subsequent improper or impermissible investment of the Fund and De Rance shall assist [PaineWebber] in correcting or avoiding the same.

### D. PaineWebber's Operation of the Account

PaineWebber sent DeRance two types of reports: daily transactions slips and monthly summary reports. PaineWebber sent its daily slips directly to Harry John at DeRance. DeRance does not claim that it did not receive a slip for every daily transaction in the account. John passed those slips on to Mr. Wagner, DeRance's in-house accountant, and Cecil Sanders, its outside consulting accountant.

PaineWebber sent its monthly reports directly to John and Dr. Gallagher, to Sanders, the outside consulting accountant, to John Miller, DeRance's outside counsel, and to the Arthur Young & Co. partner serving as DeRance's outside auditor. The monthly statements were also reviewed by Mr. Wagner, the internal accountant at DeRance. Sanders used PaineWebber's monthly statements to prepare a monthly report to DeRance's Board of Directors.

Sarnoff began trading on DeRance's behalf on February 23, 1983, the date on which the Agreement became effective. On that date, the $8 million in T-bills had grown to more than $8.3 million with interest. On August 25, 1983, after six months of trading, during which time the price of gold had declined, Sarnoff wrote to John that the account had had a "gain of $2,201,-103.57." In a handwritten note dated August 9, 1983 to Howard Berg, a PaineWebber executive vice-president then in charge of its commodities division, Ryan, the compliance director whose earlier prophesies of doom had gone unheeded, characterized

Sarnoff's August 25 letter as "totally misleading." That same day, Ryan wrote to Clarke Young at PaineWebber with copies to Berg and Sandridge, recommending that PaineWebber send a revised letter to DeRance and conduct an independent audit of the account "to ensure that Mr. Sarnoff's accounting is accurate." But PaineWebber did not confront Sarnoff with this, and Sarnoff never corrected his assertion.

Around September, 1983, PaineWebber changed the format of its monthly reports. The new format contained a profit and loss number that included unearned premiums from options transactions and therefore could mislead persons unsophisticated in commodity trading. In addition to falsely stating the profits on the account, the monthly reports were replete with errors. During the trial, PaineWebber's own inside counsel was, on cross-examination, unable to determine from the monthly account statements on which days, if any, PaineWebber and Sarnoff had violated the Agreement.

At the end of 1983, Arthur Young & Co., in its routine annual year-end audit, concluded that PaineWebber and Sarnoff were complying with the Agreement in their handling of the account. By the end of June, 1984, the value of the account had grown to approximately $9.6 million, in part because some of DeRance's investment remained in T-bills.

### E. DeRance Account Losses

In July, 1984, Sarnoff changed the F Fund's trading strategy by trading much more actively and buying more positions in gold futures and gold futures options. This trading strategy was not set out in the appendix to the Agreement containing acceptable trading strategies. He did not seek DeRance's permission to do this or notify them of the change. At one point, the account went long [4] 290,000 ounces of gold (when the Agreement specified that DeRance's investment objective was to acquire 15,000 ounces). This strategy backfired; in July, 1984, the F Fund lost $4.6 million. On August 7, 1984, when Sarnoff mailed to John his customary monthly summary letter, the letter did not mention this $4.6 million loss. Rather, the letter obliquely stated that "[d]uring July there was a sudden decline in the gold price and many put options that expired in farther out months were exercised." [5]

When PaineWebber sent DeRance its monthly report for July, 1984, it contained an error of more than $2 million. When Sanders, DeRance's accountant, discovered this error, PaineWebber corrected it. When Sanders delivered his monthly report to DeRance's Board of Directors in August, 1984, the report correctly reflected the $4.6 million loss. Yet, when the directors learned of this loss, they did not talk to Sarnoff or anyone else at PaineWebber about it. The directors were confident Sarnoff could recoup the losses, as he had done in the past.

After the initial loss, Sarnoff and other PaineWebber executives began to meet daily. Sarnoff continued with the new strategy, and in the next two months, the account earned more than $500,000. Because PaineWebber allowed Sarnoff to keep trading, a reasonable juror could infer that PaineWebber decided to allow Sarnoff to trade out of the bad position to make the money back.

DeRance's experts testified that during the last half of 1984, defendants continuously violated the Agreement's trading restrictions. During this time, PaineWebber's internal compliance department demanded that PaineWebber obtain an "activity letter" from DeRance in which the client acknowledges that increased trading in its account matches its "trading objectives and financial circumstances." Pai-

---

4. *See* fn. 2, *supra.*

5. "A commodity option vests a person with the right, for a specified period of time, to either buy or sell the subject of the option at a predetermined price. The option will expire at the end of the period unless the person exercises his or her right to complete the transaction. The holder of an option to buy is said to have a *call* option, while a right to sell is commonly referred to as a *put* option." 1 P. Johnson & T. Hazen, *Commodities Regulation* § 1.07 at 22 (1989) (emphasis in original).

neWebber never solicited such an activity letter from DeRance. In addition, as a result of the new strategy, DeRance's account became highly leveraged. During 1984, margin calls were required approximately 169 times. The calls frequently exceeded $8 million. Contrary to accepted industry practice, however, PaineWebber did not send margin calls to DeRance or otherwise notify it of its undermargined status. Rather, it left to Sarnoff all margin decisions on the DeRance account. Similarly, PaineWebber allowed Sarnoff to exceed frequently the internal trading limit it had assigned to DeRance's account. The evidence conflicts regarding what PaineWebber did or should have done to properly monitor the DeRance account. Some at PaineWebber may have been genuinely concerned and were doing what they could. Others were apparently "looking the other way" since, investment practices and results notwithstanding, commissions were bountiful. In any event, a reasonable jury could have found that PaineWebber intentionally failed to supervise or control Sarnoff because he was the only one earning commissions for its commodities business.

### F. DeRance Decides To Close Out The Account

In October, 1984, due to a lawsuit (unrelated to the DeRance account at PaineWebber) filed by Mrs. John and Gallagher, Harry John was suspended from his position at DeRance. In late October, at DeRance's request, W.R. Grace & Co. loaned one of its key financial executives, J.P. Bolduc, to replace John in managing DeRance's finances. Bolduc reviewed all of DeRance's various fund activities, turning to the F Fund last because PaineWebber was "a credible, large, reputable firm." In the interim, Sarnoff continued to misrepresent the facts. On December 4, 1984, Sarnoff wrote to Erica John and Gallagher at DeRance that he had "been careful not to exceed the reportable futures limit in gold." DeRance had, in fact, held reportable futures positions in 107 of the 245 trading days in 1984, and had held reportable options positions for almost every trading day that year, though PaineWebber had not fulfilled its contractual obligation to notify DeRance of those reportable positions.

When Bolduc did turn to the F Fund's monthly account statements, he "couldn't understand the symbols and the abbreviations and the numbers." On December 10, 1984, two of Bolduc's assistants met with several PaineWebber employees including Sarnoff and his branch manager, David Culpepper, and discussed the size of the account—then down to a net value of approximately $3.1 million—and the account's trading history. The PaineWebber contingent assured Bolduc's assistants that the account would continue to have a positive balance so long as gold did not drop more than thirty dollars per ounce, but that liquidation could be easily and quickly accomplished. In accordance with DeRance's request, several days after the meeting PaineWebber sent to DeRance a letter on December 17, 1984 describing the amount of PaineWebber's commissions as follows: "Commissions have averaged approximately $48,258 per month in 1983 and $268,90 [sic]. in 1984." Both assistants testified that they thought that 1984 figure was intended to be "$26,890." rather than $268,900." After liquidation, they discovered that the "$268,900" monthly figure was the correct one. In less than two years of trading, PaineWebber charged DeRance $3.3 million in commissions.

On December 17, 1984, DeRance ordered PaineWebber to liquidate DeRance's account, with its accumulated gold bullion. By this time the account was undermargined by $12 million. On the first day of liquidation, Sarnoff's supervisor told DeRance that they would be able to salvage $2.5 million from the account. Three days later, when the liquidation was over, the account had a deficit of $3.2 million because Sarnoff had, in a last-ditch effort to recoup losses, increased DeRance's risk of loss during the liquidation by increasing the long position. DeRance's experts testified that if PaineWebber had followed the Agreement during the last six months of 1984, the account would have lost less than

$675,000, and PaineWebber would have earned less than $300,000 in commissions.

## II. NATURE OF THE PROCEEDINGS

On January 9, 1985, DeRance sued PaineWebber and Sarnoff, alleging in relevant part breach of contract, fraud, and breach of fiduciary duty. For ease of reference, the fraud charges can be analytically divided into two separate claims: first, that defendants made fraudulent representations regarding their competence and the risk involved, with DeRance opening and maintaining the account based upon those representations; second, that defendants breached their fiduciary duty to DeRance by mishandling the account. DeRance sought compensatory and punitive damages.

Defendants filed an answer denying all the material allegations of the complaint and interposing affirmative defenses of ratification, waiver, and estoppel. These defenses in essence asserted that DeRance knew of the trading activity in its account and approved of that activity, taking a chance on the gold market. PaineWebber also filed a counterclaim against DeRance seeking to recover the $3,278,537 debit balance (including margins and commissions) in DeRance's account.

The parties tried the case before a jury from April 21 through May 9, 1986. The jury returned a general verdict awarding DeRance $7.7 million in compensatory damages jointly and severally against both defendants. The jury further specifically found defendants liable for fraud and breach of fiduciary duty under Wisconsin common law and awarded punitive damages of $20 million against PaineWebber and $500,000 against Sarnoff. The jury rejected PaineWebber's counterclaim. Defendants filed post-trial motions for judgment notwithstanding the verdict or, in the alternative, for a new trial. DeRance moved for prejudgment interest.

On September 9, 1986, the district court denied defendants' motion. The court found that there was sufficient evidence to support the jury's award:

> Paul Sarnoff lied to the plaintiff's representatives before they hired him to make the investment decisions for the foundation. He lied after he was hired and he lied at trial. Mr. Sarnoff, quite frankly, is a liar. Although PaineWebber made a deliberate effort to keep ignorant of Sarnoff's misdeeds ... the firm was aware of at least some of Mr. Sarnoff's misrepresentations and breaches of contract.... In fact, PaineWebber compounded the problem by providing the plaintiff with misleading reports.

.    .    .    .    .

> The picture that emerged at trial was not that of an investor who was aware of its broker's indiscretions, and used the possibility of a lawsuit as a hedge in the event the broker's decisions proved to be contrary to the direction of the market, but rather, that of an investor who fully trusted a very well-paid investment advisor while that advisor breached its contractual obligations, withheld material facts, and sent the investor misleading reports and out and out lies regarding the status of the account.

The court also rejected defendants' argument that it was unreasonable for DeRance to have relied on Sarnoff and PaineWebber. The court noted that that "argument is similar to the one initially raised by defendants in this case but later dropped, that it was the plaintiff's responsibility under the contract to catch the defendants' fraudulent acts." [6] The court then held that the jury correctly rejected defendants' argument that DeRance's reliance was unreasonable. The court also upheld the amount of punitive damages: "The jury's assessment of punitive damages, roughly 2.7 times the amount it awarded in compensatory damages, was not unreasonable given

---

**6.** As will be shown in the discussion on instructions, this determination by the court is important. PaineWebber continues to imply that regardless of what it did, if DeRance had asserted itself more, the damage would have been substantially reduced. The district court observed that this issue had been dropped by PaineWebber at trial. Since it was eliminated at trial, we will not resurrect it here.

the actions and wealth of each individual defendant."

On the same day, the district court granted DeRance's motion for prejudgment interest and awarded $3,296,266.18, on top of the compensatory and punitive damages DeRance had already won. The district court entered judgment in favor of DeRance and against defendants for a total amount of $31,496,266.18 on DeRance's claims and denied PaineWebber's counterclaim for the debit balance. PaineWebber timely appeals.

## III. ANALYSIS

### A. Standard of Review

The parties agree that we review de novo the district court's denial of PaineWebber's motion for a judgment notwithstanding the jury's verdict. *See Bright v. Land O'Lakes, Inc.*, 844 F.2d 436, 441 (7th Cir. 1988). We cannot set aside the verdict if " 'there is substantial evidence to support the jury verdict ... when viewed in the light most favorable to the party winning the verdict.' " *Id.* (quoting *Christie v. Foremost Ins. Co.*, 785 F.2d 584, 585–86 (7th Cir.1986)); *accord Eisenberg v. Gagnon*, 766 F.2d 770, 778–79 (3d Cir.1985); *U.C. Castings Co. v. Knight*, 754 F.2d 1363, 1369 (7th Cir.1985). The elements of common-law fraud under Wisconsin law must be established by clear and convincing evidence, see *Lundin v. Shimanski*, 124 Wis.2d 175, 368 N.W.2d 676, 681–82 (1985). When we review the evidence most favorable to DeRance, we determine whether a reasonable jury could have found fraud against PaineWebber by clear and convincing evidence. As the Second Circuit put it, "the standard is shifted somewhat in favor" of PaineWebber's challenge to the verdict. *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970 (2d Cir.1987). This means that when reviewing the evidence most favorable to DeRance we cannot ignore the evidence presented by PaineWebber in order to evaluate the burden DeRance had to meet.

### B. Sufficiency of the Evidence

■ Our review of this very extensive record and the district court's incisive observations lead us to conclude that there was sufficient evidence from which a jury could find that DeRance has proven by clear and convincing evidence that PaineWebber and Sarnoff committed fraud. Both defendants combined to create a false impression of exceptional competence in investing and trading gold on the one hand, and of limited risk and security in a very risky area on the other hand. This false impression induced DeRance to open the F Fund and to continue to operate in the face of heavy potential and actual losses. This is fraud under Wisconsin law. *See Lundin v. Shimanski, supra; see also Western Industries, Inc. v. Newcor Canada Ltd.*, 739 F.2d 1198, 1206 (7th Cir.1984).

PaineWebber naturally points to the activity (or more appropriately, the absence of activity) by DeRance in allowing Sarnoff to continue even when the risk and losses should have been apparent. The record is replete, however, with evidence of PaineWebber's misdeeds which would enable the jury to clearly conclude that DeRance had reason to rely on PaineWebber's competence and expertise which, coupled with continuous Sarnoff reassurances, overrode any signal to DeRance to intervene.

### C. Jury Instructions

These facts notwithstanding, however, PaineWebber insists that had the jury been properly (in its view) instructed it could have found for the defendants. PaineWebber's most substantial contention is that the court erred in instructing the jury concerning the existence and scope of its fiduciary obligations to DeRance in light of ¶ 6(j)(iii) of the Agreement, which required DeRance to review PaineWebber's reports and to report any "impermissible" investments to PaineWebber. The first part of the challenged instruction provided as follows:

*Breach of Fiduciary Duty/Fraud*

The second claim of DeRance is that the defendants PaineWebber and Paul Sarnoff breached their fiduciary duties

to DeRance and committed fraud in connection with the DeRance account under the common law of the State of Wisconsin.

A fiduciary relationship exists, within the Wisconsin common law of fraud, when confidence is reposed on one side and there is resulting superiority and influence on the other side. In this case, Paul Sarnoff and PaineWebber are fiduciaries. The nature of a fiduciary relationship may be varied by contract.

Fraud in the common law sense of deceit is committed by misleading another by words, by acts, or in some instances—notably where there is a fiduciary relationship which creates a duty to disclose all material facts—by silence.

The defendants are guilty of common law fraud if they committed acts which were misleading when made, or failed to disclose, false and misleading statements to DeRance, upon which DeRance relied to its detriment. PaineWebber and Paul Sarnoff need not have known that such acts, statements, and omissions were false and misleading or have made them with a fraudulent intent or evil motive to mislead or injure DeRance.

The second part of the challenged instruction provided as follows:

*Common Law Fraud—Presumption and Burden of Proof*

You cannot find the defendants made false or fraudulent representations to plaintiff from conjecture or mere inference. Fraud must be clearly proved, and the burden of proof is on plaintiff to establish that fact by clear and convincing evidence.

Finally, the third part of the contested instruction provided as follows:

*Right to Rely on Fiduciary*

When a fiduciary relationship exists, the injured party is not under any duty to make inquiry to discover that the relationship has been abused. In such a case, so long as the relationship continues unrepudiated, there is nothing to put the injured party on inquiry, and he cannot be said to have failed to use due diligence in detecting the fraud. A fidu-

ciary relationship by its nature gives the beneficiary of the relationship the right to relax the care and vigilance which the law ordinarily requires and he would customarily exercise on his own behalf. He may rely on the good faith of the other party.

This general instruction correctly states Wisconsin law on the significance of a fiduciary duty. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck,* 127 Wis.2d 127, 377 N.W.2d 605, 608–09 (1985); *see also Williams v. Rank & Son Buick,* 44 Wis.2d 239, 245–46, 170 N.W.2d 807, 811 (1969); *see generally United States v. Dial,* 757 F.2d 163, 168 (7th Cir.), *cert. denied,* 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985). However, "[a] broker's duty to his customer can be modified in important respects by contract ... so that without clarification of the terms of the contracts, the scope of [the broker's] fiduciary duty is undefined." *Chipser v. Kohlmeyer & Co.,* 600 F.2d 1061, 1066–67 (5th Cir.1979). *See generally Commodity Futures Trading Comm'n v. Heritage Capital Advisory Services, Ltd.,* 823 F.2d 171, 173 (7th Cir.1987); *David K. Lindemuth Co. v. Shannon Financial Corp.,* 660 F.Supp. 261, 265 (N.D.Ca.1987).

■ We note at this point that there was no record of a formal instruction conference before the instructions were read to the jury; thus we are not able to determine whether specific instructions were withdrawn, modified, or rejected. Nevertheless, the court did adopt the uncustomary procedure of allowing counsel to object to the instructions only after it had charged the jury (but before the jury began deliberating). While unusual, there was sufficient opportunity for the court to amend any instructions given, and the court indicated a willingness to do so. The district court warned counsel that the only way to preserve an objection would be to object at that time. As discussed here, PaineWebber objected to the reliance instruction as given by the court. It also objected to two other instructions not now on appeal; for one, the court was willing to call the jury back to modify the instruction, but PaineW-

ebber decided not to pursue it. Finally, as discussed below, PaineWebber objected that the court did not give its proposed Instruction 17A. Any other instructions PaineWebber submitted in advance of trial but did not specifically preserve at this unusually timed instruction conference are waived.

Mr. Unger, PaineWebber's counsel, did object to the third part of the instruction regarding the right to rely as follows:

> THE COURT: Do you claim that your client is not a fiduciary?
>
> MR. UNGER: No, ... because they were managing money.... What I am saying here is that ... DeRance ... was under a duty to make inquiry under the contract which Your Honor charged may vary the nature of the fiduciary relationship. And therefore we think that that charge is erroneous in the circumstances of this case. And we object to it.

PaineWebber did in advance of the trial submit other instructions—in particular Instructions Nos. 23, 24, and 28A—more elaborately setting forth contractual limits on its fiduciary duty. Instruction No. 28, for example, provided in pertinent part: "Any failure by plaintiff to review the reports constitutes a material breach of the agreement. If you find that plaintiff failed to satisfy ¶ 6(j)(iii), then you must find that plaintiff is not entitled to recover against defendant." By not raising the court's failure to give those instructions when invited to do so by the court, however, PaineWebber has waived any appeal. If there was a charging conference, it was conducted off the record (perhaps right before the trial), and thus there is no indication that PaineWebber objected at the charging conference. Here, for all we know, defendants could have agreed to a change in instructions at the charging conference. As noted above, in rejecting defendants' argument that it was unreasonable for DeRance to have relied on Sarnoff and PaineWebber, the court noted that that "argument is similar to the one initially raised by defendants in this case but later dropped, that it was the plaintiff's responsibility under the contract to catch the defendants' fraudu-

lent acts." It would make strategic sense for PaineWebber's counsel to have abandoned that line of argument at trial, for it could alienate a jury. In any event, the district court did not abuse its discretion in finding that PaineWebber had waived the issue regarding any contractual modification of its fiduciary duty by the time it moved for a judgment n.o.v.

In addition, the court did instruct the jury in the first part of the instruction that "the nature of the fiduciary relationship may be varied by contract." Thus, the first part of the instruction allows an argument that a fiduciary duty can be modified by contract. The third portion, while ambiguous, then describes what happens when that fiduciary duty is not so modified. The third part of the instruction would have been more precise if it explicitly stated that it was referring to a fiduciary relationship unmodified by contract, but this somewhat ambiguous instruction given the facts here is not a sufficient ground for setting aside the verdict. *See Needham v. White Laboratories, Inc.*, 847 F.2d 355, 360 (7th Cir.1988).

PaineWebber was not content with merely informing the jury that its fiduciary duty could be modified by agreement; it continues to claim that DeRance cannot rely on PaineWebber's alleged misrepresentations unless DeRance first shows that it exercised due diligence. But this theory presents a question separate from PaineWebber's duties and instead allows for the possibility of mutual duties of care. Even treated as a "dual care" case, ¶ 6(j)(iii) did not relieve PaineWebber's responsibility to exercise the care required by contract and by its fiduciary duty. Aside from the very large numbers involved, this is a fundamental fraud case. In traditional tort law —and when the numbers are stripped away this is a pristine fraud case—contributory negligence does not bar recovery for an intentional or reckless tort. *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 527–28 (7th Cir.1985). In a similar context *Angelos* examined a failure by trustees of a pension fund to adequately investigate a loan. We held that this fail-

ure did not excuse the borrower's fraud in inducing the loan; investigations by investors "are distinctly second-best" solutions:

> The best solution is for people not to harm others intentionally, not for potential victims to take elaborate precautions against such depradations. If the victims' failure to take precautions were a defense, they would incur costs to take more precautions (and these costs are a form of loss victims would feel in every case, even if the tort does not occur), while wouldbe tortfeasors would commit additional torts because they would not fear the need to pay up in cases where the victims do not protect themselves. Common law torts have balked at such an outcome in ordinary tort cases, and securities law has followed the same path.

*Id.* at 528. As under § 17(a)(1) and Rule 10b–5, however, the Agreement provided that DeRance could not close its eyes to a known risk (which, as mentioned below, would also defeat reliance).

In the challenged instruction, the district court did not instruct the jury that DeRance could cast away all prudence. Rather, the court informed the jury that DeRance could not recover if it knew that PaineWebber superseded the trading plan and put its assets at greater risk. That is what the Agreement says; DeRance needed to advise only of those impermissible investments that it *knew* about. For PaineWebber to prevent DeRance from proving reliance under Wisconsin law, PaineWebber would have to show that DeRance disregarded a harmful risk *known* to it, and PaineWebber had full opportunity to and did argue to the jury that DeRance did disregard a known risk. The jury was able

to conclude that such a risk was not known to DeRance.

In addition to his objection to the instruction given to the jury, PaineWebber's counsel also objected to the court's refusal to give PaineWebber's proposed Instruction No. 17A.[7] The court did not err in refusing to give the instruction. Instruction No. 17A, which would have instructed the jury that recklessness by DeRance would preclude a jury finding of reliance, is consistent with its objections to the instructions that were given. It is another way to impose some level of due diligence on DeRance to discover PaineWebber's abuses. In Instruction No. 17A, the Agreement is emphasized not because it changed PaineWebber's fiduciary duties but rather because it focused on reasonable reliance and how vigilant DeRance should have been. What PaineWebber's duties were, which was the subject of PaineWebber's other proposed instructions, is independent of whether DeRance relied on PaineWebber's misrepresentations. With this instruction, PaineWebber was trying to say that DeRance could not have reasonably relied on its fraudulent statements. That instruction was addressed solely to the reliance necessary for DeRance to succeed on its claim for common law fraud.

The court, nevertheless, effectively tendered the portions of Instruction No. 17A defining how to negate reliance when it instructed the jury regarding PaineWebber's affirmative defenses. There, the court instructed that

> if DeRance did not do the minimum necessary to protect itself against any loss incurred, and DeRance had full knowledge of all transactions when they were

---

7. PaineWebber's proposed Instruction 17A provided in full as follows:

> *Defendants' Instruction No. 17A*
> *Reliance—Plaintiff's Recklessness*
> If you determine that Plaintiff recklessly failed to review reports and information provided to it by Defendants, then Plaintiff is barred from recovery against Defendants. Plaintiff's conduct in that regard was reckless if it was highly unreasonable for Plaintiff, given the express terms of the Commodity Trading Advisor Agreement, to fail to review the reports and information. Alternatively, if

> you find that Plaintiff was aware of certain risks, but assumed those risks in disregard of or despite the potential that damages might be caused, then Plaintiff cannot recover from Defendants.
> *Restatement (Second) of Torts* § 503 (1965); *Mallis v. Bankers Trust Co.*, 615 F.2d 68 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981) (securities); *Dupuy v. Dupuy,* 551 F.2d 1005 (5th Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977) (securities).

occurring and had the ability to understand and in fact did understand those transactions, then DeRance may not recover.

Thus, we are not convinced that the court's failure to give Instruction No. 17A affected the jury's understanding of the case. The instructions as a whole nowhere contradicted the premise of Instruction No. 17A, which is also the premise of PaineWebber's affirmative defenses relating to the Agreement, that if DeRance knew of impermissible investments and did nothing, then it cannot complain. There were sufficient charges to the jury, in particular with regard to PaineWebber's affirmative defenses, that if the jury found that DeRance consciously disregarded information, then PaineWebber would win. Therefore we will not reverse on account of the instructions.

### D. Excluded Evidence About Other Investments

As stated above, DeRance had extensive investments in other funds not handled by PaineWebber. PaineWebber claims that the district court erred in restricting pretrial discovery and excluding evidence at trial about DeRance's other (non-gold) investments, limiting evidence at trial to the F Fund. The court made clear—after pointed argument by the parties—that non-F Fund evidence was irrelevant.

In deciding whether to exclude evidence, the district court has broad discretion and we accord its decision "great deference." *Michaels v. Michaels*, 767 F.2d 1185, 1200 (7th Cir.1985). In particular, "[q]uestions of admissibility of prior acts are peculiarly within the province of the trial court. Particularly when admission of the challenged evidence is likely to be cumulative and confusing, we will not overturn the sound exercise of the trial court's discretion." *Panter v. Marshall Field & Co.*, 646 F.2d 271, 296 n. 8 (7th Cir.1981). To show reversible error, PaineWebber must show that there was prejudice to its substantial rights. *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1266 (7th Cir.1988).

Evidence regarding DeRance's investment goals and the risk it was willing to

assume was part of PaineWebber's defense. DeRance consistently claimed that its investment goals for the F Fund were for a conservatively managed fund. PaineWebber in turn sought to show that DeRance was a sophisticated speculator continuing to gamble with the F Fund. Yet PaineWebber was never able to tell the jury about how DeRance's other funds lost $48 million in penny stocks, silver mines, deep-sea treasure hunts, and Mexican mutual funds. Although it would be a risky tactic for PaineWebber to offer as its defense that it was not any worse than the rest of them, the evidence could counter DeRance's portrayal of itself at trial as a charity looking for a conservatively managed investment. PaineWebber also could not tell the jury that, as one of DeRance's investment advisors testified in a deposition, the $150 million E Fund contained obscure common stocks. John testified that around 1980, the directors of DeRance decided to look for investments "more adventurous than some of the common stocks were." PaineWebber, however, could never show the jury what the common stock holdings were. DeRance's internal accountant Sanders prepared monthly reports, which were admitted into evidence, and they contained information about all of DeRance's investment funds. But the court did not allow PaineWebber to call the jury's attention to the contents of the non-F Fund portions of these reports. PaineWebber argues on appeal that if the jury had known about all these investments it could evaluate "just how 'conservative' DeRance wanted its PaineWebber account to be."

DeRance's investment expectations should be distinguished from its sophistication and general experience. DeRance's experience in managing and understanding investments in large part determines whether DeRance justifiably relied on PaineWebber's misrepresentations and PaineWebber's affirmative defenses of ratification and estoppel. Before the district court, PaineWebber's trial counsel acknowledged the difference between sophistication and general experience:

We are not interested, and I think I have said this before, we are not interested in every investment that they made in any account. That's not the point here. This case deals with—we recognize it with this account. We are interested in ascertaining the broad sophistication and broad experience that DeRance had and that the people at DeRance had with investments.

\* \* \* \* \* \*

We're really not interested in specific transactions.

At trial PaineWebber examined DeRance's principals and advisors about their education, financial knowledge, and general investment experience. While PaineWebber did not know the identity of the stocks in the E Fund, it was able to put before the jury the fact that DeRance had $150 million in common stocks, which it was trading actively, and that the average annual return from the E Fund equaled 22 percent.

■ DeRance's specific investment goals in other funds, as opposed to its general sophistication, is only tangentially relevant to whether it relied on PaineWebber's misrepresentations in setting up and maintaining the F Fund.[8] An investor can have highly speculative investment goals yet reasonably rely on his broker faithfully carrying out those goals. DeRance claimed that it thought it was dealing with an honest and competent executor of what may have been a faulty strategy. What is relevant here is whether this investment by DeRance was induced and sustained by PaineWebber's fraud. Its expectations with regard to other investments is only marginally relevant; what its expectations were here were governed by an agreement which took four months to negotiate. The Agreement itself established DeRance's objective to acquire 15,000 ounces of gold bullion. While the Agreement did not fully specify how much risk DeRance would accept, it did state that DeRance did not want to expose itself to any loss beyond that associated with owning the gold. What DeRance may have done with other funds is not highly probative in the absence of some theory that DeRance was characteristically exposing itself to fraud. For example, if PaineWebber was claiming that DeRance contracted for conservative investment strategies in its "D" and "E" Funds, and then routinely abandoned these strategies and engaged in high-risk ventures, perhaps the other fund activity would be probative. But no such claim exists here. The additional discovery would be based on pure speculation. For these reasons, and because PaineWebber was able to introduce bountiful credible evidence as to DeRance's sophistication, we conclude that the district court did not abuse its discretion in excluding specific details about DeRance's other investments.

■ Similarly, a district court has broad discretion to limit discovery. *Travelers Ins. Co. v. Transport Ins. Co.*, 846 F.2d 1048, 1053 (7th Cir.1988). When a district

8. The court also charged the jury that churning, or excessive trading, constitutes common law fraud. To determine churning, the court correctly charged the jury to determine if there was "excessive trading, in the account, considering the objectives and nature of the account." The court then charged the jury that a departure from an agreed-upon strategy may show excessive trading.

PaineWebber in its brief emphasizes the relevance of churning cases and cites *Fey v. Walston & Co.*, 493 F.2d 1036, 1045 (7th Cir.1974), to argue the importance of exploring in detail an investor's sophistication in securities. "In a churning case the independent objectives of a customer are an important standard against which to measure claimed excessiveness. Certainly, evidence bearing upon the experience, sophistication, or trading naivete of the customer may be highly significant." *Id.* Previous trading would also be relevant to whether PaineWebber's trading was excessive and whether the broker was in control. *See Hotmar v. Lowell H. Listrom & Co.*, 808 F.2d 1384, 1386 (10th Cir.1987).

DeRance's investment goals are relevant to churning and whether DeRance breached the Agreement. But in *Fey* and *Hotmar*, the customer did not divide his trading into separate funds. In contrast, DeRance set up a discretionary commodities fund with a limited trading plan, and its allegations of churning revolve not around the frequency of trades but rather the size of trades—and its attendant larger commissions—in that specific fund. Thus, to ask whether PaineWebber churned is to ask whether it breached the Agreement.

court erroneously denies discovery, it is reversible only "if the denial resulted in actual and substantial prejudice to the complaining litigant." *Id.* Because we hold that DeRance's other investments are not directly probative of the issue in this case, examining the details of each of DeRance's other investments would have substantially increased the burdens of discovery without likely leading to the discovery of relevant evidence. Therefore, we find that there was no actual and substantial prejudice to PaineWebber in the district court's denial of the discovery into DeRance's investment activity in its other funds.

### F. Closing Argument

PaineWebber next contends that the jury's verdict cannot be allowed to stand because it resulted from passion and prejudice. PaineWebber in particular challenges on appeal three portions of DeRance's rebuttal argument on punitive damages. First, DeRance argued that PaineWebber was trying to mislead the jury:

> They are sure that you, a midwestern jury from a conservative city like Milwaukee is not going to impose a meaningful penalty on them. A million dollars is a lot of money in Milwaukee.... And they believe ... that a jury ... not familiar with finance ... is going to be reluctant to impose the kind of penalty that would really kick them in the seat of their pants.

Second, continuing with the theme of "us-against-New York," DeRance's lawyer railed against this "Wall Street" corporation:

> I want you to impose a penalty on PaineWebber ... that will make every other brokerage firm in this country sit up and take notice. That a jury in Milwaukee will not tolerate fraud, will not tolerate deceit and will not tolerate an attempt to then blame the account when they don't catch you.... I know that if we simply give DeRance its money back, that's not going to rattle a single spoon, not a solitary china plate in a board room on Wall Street. The head of PaineWebber is still going to be sipping sherry out of

crystal goblets with its vice president Paul Sarnoff, enjoying a hearty laugh at our expense, if we do no more than return a cheated customer the money that was taken from him.

Third, PaineWebber believes that DeRance's lawyer unfairly suggested to the jury that PaineWebber had also cheated many other customers: "For every cheated customer that complains, how many are silent? For every cheated customer that sues, how many lose?"

■ Following DeRance's rebuttal, and before the court charged the jury, PaineWebber objected to the entirety of the rebuttal argument on punitive damages as "inflammatory and prejudicial" and moved for a mistrial. In *Wildman v. Lerner Stores Corp.*, 771 F.2d 605 (1st Cir.1985), the court refused to review objections to closing argument because counsel had failed to "object at the time that allegedly improper statements were made or move for a mistrial before the verdict was returned." 771 F.2d at 609. We do not think that this means that the choice is between objecting at the time the argument is made or simply moving for a mistrial. As with any motion, a motion for a mistrial, whether oral or written, must also specifically state the grounds of the motion. Moving for a mistrial alone is not sufficient to preserve any objections for appeal. In a related vein, PaineWebber did not request a curative instruction. *Cf. Leathers v. General Motors Corp.*, 546 F.2d 1083, 1086 (4th Cir. 1976). Thus, PaineWebber has waived any objection to DeRance's "us-against-them" arguments.

■ On the merits, courts have consistently condemned appealing to local sentiment in arguments. *See, e.g., Herman v. Hess Oil Virgin Islands Corp.*, 524 F.2d 767, 771–72 (3d Cir.1975); *see also Cole v. Bertsch Vending Co.*, 766 F.2d 327, 333 (7th Cir.1985). When read in context, however, DeRance's argument was not an impermissible "us-against-New York" argument but rather a colorful variation of the argument that punitive damages must serve as an example to the particular com-

munity, and here that particular community was large Wall Street brokerage houses.

PaineWebber did properly object to DeRance's argument that the jury should think of other "cheated customers" in computing punitive damages. The district court overruled the objection.

■ Whether counsel's argument was permissible must fall within the district court's discretion:

> In determining whether "there is a reasonable probability that the verdict of a jury has been influenced" by improper conduct, warranting that the verdict be set aside, a court must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g., whether it is a close case), and the verdict itself.

*City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir.1980). We agree with PaineWebber that closing argument must be "confined to the evidence admitted in the case and reasonable inferences drawn therefrom." *Ayoub v. Spencer*, 550 F.2d 164, 170 (3d Cir.), *cert. denied*, 432 U.S. 907, 97 S.Ct. 2952, 53 L.Ed.2d 1079 (1977). There is no evidence in the record that PaineWebber had cheated other customers. But counsel's reference to silent "cheated" customers did not refer to PaineWebber at all. We look at counsel's argument as a way of summarizing to lay people the theoretical economic argument that damages will not deter cheating in the future if a cheated investor is only given back his lost investment; then over the long run the broker will win by cheating customers who do not find out or sue. *See Emery–Waterhouse Co. v. Rhode Island Hosp. Trust Nat'l Bank*, 757 F.2d 399,

410–11 (1st Cir.1985). In assessing punitive damages, a jury may take into account how often the conduct is likely to be detected. A sizable punitive award would make the conduct unattractive even given the times when it is not detected. Thus, the district court did not abuse its discretion in holding that there was no "reasonable probability" that the jury's verdict was influenced by improper argument. *See Joan W. v. City of Chicago*, 771 F.2d 1020, 1022–23 (7th Cir.1985).

### G. Punitive Damages [9]

We do agree with PaineWebber that the jury's assessment of $20.5 million in punitive damages was excessive. The jury awarded punitive damages under Wisconsin common law. For purposes of our analysis, we assume that the jury found that defendants intentionally committed fraud in inducing DeRance to set up and maintain the F Fund and committed a breach of its fiduciary duty in handling it. This supports an award of punitive damages. *Ma v. Community Bank*, 686 F.2d 459, 467 (7th Cir.), *cert. denied*, 459 U.S. 962, 103 S.Ct. 287, 74 L.Ed.2d 273 (1982) (applying Wisconsin law); *see Lundin v. Shimanski*, 124 Wis.2d 175, 368 N.W.2d at 686–87. In affirming the award of punitive damages, the district court reasoned as follows:

> The punitive damages award here sends a message to PaineWebber, Sarnoff, and other investment advisors entrusted with client's money that there are heavy costs associated with putting their interests ahead of their client's. Rather than just considering the profit to be made on ill-gotten commissions, discounted by the possibilities of detection and adverse judgments ordering recoupment of losses, advisors must also consider the potential that a jury will be suitably outraged by an advisor's treatment of a client to

**9.** We are aware that the Supreme Court is presently reviewing the question of whether a punitive damages award may violate the Constitution. *See Kelco Disposal, Inc. v. Browning–Ferris Industries*, 845 F.2d 404 (2d Cir.1988), *cert. granted*, —— U.S. ——, 109 S.Ct. 527, 102 L.Ed.2d 559 (1988). PaineWebber, while objecting to the punitive damages award, has not challenged

its constitutionality, and thus the issue is not before us in this case. Regardless of how the Supreme Court resolves this issue, we are obliged to apply Wisconsin law as we find it. *See Bankers Life & Casualty Co. v. Crenshaw*, 486 U.S. 71, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988).

award substantial punitive damages. The conduct at issue here, breach of fiduciary duty and fraud both by omission and commission, not to mention defendant's violation of both the law and their own policies governing such accounts, is very serious indeed. Such activity shakes people's faith in the market and their ability to rely upon investment advisors, and demands heavy punishment.

\* \* \* \* \* \*

Such awards can help to discipline the market and promote candor from fiduciary to client. Both the market and the law demand this as there is no conceivable social benefit in the breach of fiduciary duty and fraud proven in this action. The most effective deterrent to an advisor's breach of his duty out of self-interest or potential profit is to make the costs of such activity prohibitive.

Here, the punitive damages award was approximately 2.7 times the award of compensatory damages. This ratio does not by itself suggest an unreasonable award. *See, e.g., Fahrenberg v. Tengel*, 96 Wis.2d 211, 291 N.W.2d 516, 527–28 (1980); *Aldrich v. Thomson McKinnon Securities, Inc.*, 756 F.2d 243, 249 (2d Cir.1985) (8.6:1 ratio); *Miley v. Oppenheimer & Co.*, 637 F.2d 318, 331–32 (5th Cir.1981) (three times compensatory damage figure is a standard formula for assessing whether jury abused its discretion in awarding punitive damages in intentional business tort case). Under Wisconsin law, however, "[t]he test of excessiveness does not necessarily depend upon some arbitrary proportion." *Malco, Inc. v. Midwest Aluminum Sales, Inc.*, 14 Wis.2d 57, 109 N.W.2d 516, 521 (1961); *see Fahrenberg, supra*, 291 N.W.2d at 527. In addition, concern for avoiding a windfall for a plaintiff becomes "paramount where . . . plaintiffs have been awarded substantial compensatory damages. . . ." *Bell v. City of Milwaukee*, 746 F.2d 1205, 1267 (7th Cir.1984). "Under the law which governs the amount of punitive damages, we have indicated that we must reject the amount of a jury's award if it exceeds what was required to serve the objectives of deterrence and punishment." *McKinley v.*

*Trattles*, 732 F.2d 1320, 1327 (7th Cir.1984). Punitive damages should not go beyond deterrence and become a windfall. *Lenard v. Argento*, 699 F.2d 874, 890 (7th Cir. 1983).

When reviewing the amount of a punitive damages award, we must consider the purpose. Under Wisconsin law, any punitive award which is more than is necessary to punish or deter "or which inflicts a penalty . . . disproportionate to the wrongdoing is excessive. . . ." *Fahrenberg, supra*, 291 N.W.2d at 527. Under this standard, the punitive damages award here is excessive. This standard needs to be applied to the actions of the plaintiff as well as those of the defendant. Punitive damages are meant not only as a punishment to the defendant but also as a warning to others that fraud does not pay. At the same time, the award alerts possible fraud victims not only that perpetrators may be punished, but also that a victim's own acts in the face of fraud will have an effect on the amount. By examining PaineWebber's side of this story we find some moderating influence that justifies a reduction in the amount awarded here.

DeRance was a foundation—experienced in highly speculative investments—with a three-person Board of Directors, and outside investment advisors, accountants, and lawyers. DeRance sought out Sarnoff and insisted on investing in gold futures and options even when PaineWebber warned how risky these investments were, though PaineWebber gave many contradictory signals as well. John was so excited about gold trading that he wanted to invest $20 million of DeRance's money in doing so. PaineWebber refused to accept more than five percent of the foundation's assets. In the fall of 1982, DeRance delivered approximately $8 million to PaineWebber. At the time John and Gallagher, the in-house accountants, signed a one-page risk disclosure statement which stated that trading in gold commodities carried a risk of losing the whole investment or more. They also signed a 23–page risk disclosure statement which highlighted in bold letters that commodities trading is volatile and involves a

lot of risk. This does not offset Sarnoff's fraud, but it does demonstrate some positive activity that should not be punished.

The parties then entered into a long period of contract negotiations. During this time, PaineWebber warned DeRance in writing about the risks involved in trading commodities. This risk disclosure warned DeRance that it could lose all of its initial margin funds and any other additional funds that it would deposit. Other documents also warned about the high degree of risk involved in purchasing and granting commodity options. More written communications warned that there could be no guarantee of profits or any limit on the loss that could be sustained in futures trading. While this does not justify fraud, it does expose the high risk even without Sarnoff's misdeeds.

At trial, John characterized one of PaineWebber's attorneys as "extremely meticulous and solicitous" about protecting DeRance. This PaineWebber attorney continually warned DeRance's outside counsel about all the risks of Sarnoff's proposed trading strategy (though not the risks of lying by a fiduciary). PaineWebber repeatedly sought to ensure that no more than five percent of DeRance's assets would be placed in the F Fund. This same PaineWebber attorney wrote to DeRance's outside counsel and stated that while Sarnoff "is an expert market analyst and familiar with the markets and has written books and understands them, that he had never actually traded an account...." Subsequently, this attorney also warned DeRance that among the risks was that the market in gold was new, the whole trading program was part of a three-year pilot program recently approved by the federal government, that PaineWebber had little experience in this field, and that the trading outlined in the proposed contract was new, untested, and untried. She again repeated that Sarnoff's experience was in analysis and not on-line trading. Unfortunately for PaineWebber, the right hand ignored what the left was doing and Sarnoff continued his errant ways.

It appears that DeRance's directors never reviewed PaineWebber's reports carefully. DeRance's outside counsel testified that "PaineWebber may have assumed that we were also reviewing the reports to see how they were doing and so on, but as a matter of fact we were not doing that." It is undisputed that PaineWebber demanded that DeRance should retain an independent outside expert to advise it on trading or at least to review and sign PaineWebber's reports. DeRance's outside counsel, Mr. Miller, rejected this demand on the ground that it was a matter of internal foundation policy.

Whatever the precise contours of its contractual duties under ¶ 6(j)(iii), DeRance was somewhat less than careful. While PaineWebber inexcusably caused the loss here, DeRance probably could have prevented much of it. This does not mitigate the fraud nor does it elevate DeRance's obligations under the contract. But PaineWebber's own positive actions presented opportunities for DeRance to intervene or inquire further. Such acts should be encouraged, not ignored by inflicting maximum punishment. Whatever ¶ 6(j)(iii) means exactly, at the very least the defendants who are now to be punished sought to arrange by contract for a joint care situation so that each side would take some care. To award DeRance substantial punitive damages would be to reward it for taking no care, much less not taking responsibility for joint care. To award excessive punitive damages here creates an incentive for parties situated similarly to DeRance to avoid any care, even when, as here, it is in a position to monitor its account, with a consequential waste of resources for no productive purpose.

■ Among the factors this court looks at in determining whether to set aside or adjust an award is "whether the award is out of line compared to other awards in similar cases." *Levka v. City of Chicago,* 748 F.2d 421, 425 (7th Cir.1984). PaineWebber deserves to be punished, but when contrasted to punitive damages awards in analogous settings, the $20 million punitive damages award against PaineWebber is significantly excessive. *Seymour v. Summa Vista Cinema, Inc.,* 809 F.2d 1385, 1390 (9th Cir.1987) (Ninth Circuit affirms

$180,000 in punitive damages); *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 703 F.2d 1152 (10th Cir.1981) (en banc), *cert. denied*, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983) (Tenth Circuit reduces $3 million punitive damages award to $1 million); *Aldrich v. Thomson McKinnon Securities, Inc.*, 756 F.2d 243 (2d Cir. 1985) ($3 million punitive reduced to $1.5 million); *Jordan v. Clayton Brokerage Co.*, 861 F.2d 172, 176 (8th Cir.1988) (district court upholds and Eighth Circuit affirms $400,000 in punitive damages against brokerage company which must have known about excessive trading and order switching by commodities future broker). In light of the purposes of punitive damages to punish and to deter, and because the seriousness of PaineWebber's wrongdoing was not commensurate with the jury's award, we reduce the punitive damages award against PaineWebber to $7,000,000. Since Paul Sarnoff appears to be the person, on his own behalf and as agent for PaineWebber, who committed most of the fraudulent activity, we affirm the $500,000 punitive damages award against him.[10]

### H. Other Issues

■ Finally, PaineWebber raises three issues that deserve but brief comment. First, PaineWebber, citing *Meke v. Nicol*, 56 Wis.2d 654, 203 N.W.2d 129 (1973), contends that the district court erred in admitting any evidence of the wealth of either defendant because DeRance sought punitive damages against both defendants as joint tortfeasors. In *Meke*, the Wisconsin Supreme Court held that "[a]lthough punitive damages may be awarded where there is one judgment against several joint tortfeasors, evidence of the wealth of any of the defendants is inadmissible." 203 N.W. 2d at 132. We reject PaineWebber's contention. While Wisconsin authority is inconclusive on the question of whether evidence about the wealth of each defendant is admissible where a separate damage award is requested against each defendant, *see Fahrenberg v. Tengel, supra*, 96 Wis. 2d 211, 291 N.W.2d 516 (1980); *Jones v.*

*Fisher*, 42 Wis.2d 209, 166 N.W.2d 175 (1969), any error by the district court in admitting this evidence is harmless. As stated in the seminal case of *Ogodziski v. Gara*, 173 Wis. 380, 181 N.W. 231 (1921):

> [I]n the case of two or more defendants the reception of such testimony is error on the ground that evidence as to the financial ability of one affects the amount of punitory damages assessed against all, and hence, since each one is liable for the whole judgment, he may be unjustly mulcted in damages because of the wealth of a codefendant, though he himself may be a poor man.

173 Wis. at 381, 181 N.W. at 231. The potential prejudice is only to the poorest defendant. Sarnoff is the only defendant who could have been prejudiced by this evidence but the substantially lower amount of punitive damages awarded against him shows that the jury made appropriate distinctions and that he was not so prejudiced.

■ PaineWebber next claims that the district court erred in admitting against defendant PaineWebber evidence of the wealth of its parent, PaineWebber Group Incorporated, and in permitting the jury to consider that evidence in assessing punitive damages against it. We disagree. The only discovery PaineWebber produced to DeRance regarding its wealth was the balance sheets of its parent. PaineWebber never made available to DeRance information confined to its function as the parent's commodities group. We need not reach whether the result might be different if PaineWebber Group were more than a holding company.

■ Finally, PaineWebber argues that the district court erred in awarding plaintiff prejudgment interest. The district court did not abuse its discretion in awarding prejudgment interest on the compensatory award, which compensates for time value of money, even with the substantial punitive damages awarded. *See Michaels v. Michaels*, 767 F.2d 1185, 1204–05 (7th

---

10. We base the reduction of the punitive damages award entirely upon the conclusion that the award was excessive because it exceeded the amount commensurate with the degree of PaineWebber's wrongdoing. Contributory negligence by DeRance is not a factor in our reduction, and we take no position on whether or not it can be used as a factor in reducing punitive damages under Wisconsin law.

Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986); *Paper Converting Machine Co. v. MagnaGraphics Corp.,* 745 F.2d 11, 23–24 (Fed.Cir. 1984).

This court's power to issue a remittitur "is the same as that of the trial court and the same standard applies to the appellate court as to the trial court in fixing the amount of the remittitur." 11 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2820 at 133–34 (1973). Accordingly, we vacate the district court's judgment on the amount of punitive damages against PaineWebber. We remand with directions that the district court enter an order for a new trial only on the issue of the amount of punitive damages against PaineWebber, unless plaintiff DeRance is willing to accept a judgment reducing defendant PaineWebber's punitive damages to $7,000,-000. *Cf. Aldrich, supra,* 756 F.2d at 249. If DeRance accepts the remittitur, the judgment is, in all respects, affirmed.

VACATED.