John B. WILSON, d/b/a Pelican
Trolling Speedometer,
Plaintiff–Appellant,

v.

ELECTRO MARINE SYSTEMS,
INCORPORATED, et al.,
Defendants–Appellees.

No. 89–2612.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 9, 1990.

Decided Oct. 4, 1990.

As Amended Oct. 11 and Oct. 18, 1990.

Edward W. Osann, Jr., Chicago, Ill., John Nesbitt, Michael D. O'Neal, Rensselaer, Ind., for plaintiff–appellant.

William O'Connor, Barry Feinberg, Zukowski, Rogers, Flood, McArdle & O'Connor, Roger J. Kelly, Chicago, Ill., for defendants-appellees.

Before COFFEY, FLAUM, and MANION, Circuit Judges.

MANION, Circuit Judge.

John B. Wilson sued Electro Marine Systems, Inc. (EMS) on six counts relating to the marketing of a boat speedometer, and EMS counterclaimed. The district court granted summary judgment for EMS on Wilson's misappropriation of trade secret, breach of contract and antitrust counts. At the close of Wilson's evidence, the district court granted directed verdicts for EMS on a copyright infringement count, and on the EMS counterclaim. At the conclusion of all evidence, after the jury returned a $185,000 verdict for Wilson on an unfair competition claim, the district court directed a verdict for EMS on that count and on Wilson's claim for punitive damages. Wilson appeals all of the adverse district court rulings, except the court's grant of summary judgment on the antitrust claim and the directed verdict on the counterclaim. We affirm.

## I. Background

The conflict between plaintiff John Wilson and defendant Ronald Overs concerned the proprietary interest over a boat speedometer used for fishing. But their independent interest in electronics and fishing existed long before their encounter in the speedometer business. An overview of the business history of the two main adversaries should be helpful.

Ronald Overs, Sr., grew up along the Niagara River in New York. As a boy his two primary interests were boating and electronics. After attending college Overs worked for Jafco, a company that sold boats and marine equipment along the Ni-

agara River. His duties at first included servicing and selling fishing boats, sailboats and boating equipment. He later became a manufacturer's representative for a company selling electrical equipment, including switches, relays, transformers and high-tech rotary switches. Overs lacked formal training in engineering, but studied periodicals and manuals from the engineering school at the University of Buffalo until he was proficient in understanding the operation of limit switches.

In 1959 Overs went into business for himself as a manufacturer's representative, acquiring product lines from companies selling limit switches and timing devices. He continued to keep up with the latest technological discoveries of the electronics age. After purchasing a sailboat, Overs in 1970 began to experiment with making a speedometer that would be accurate at low speeds. He believed existing boat speedometers were too expensive, and thought he could create one on his own because the technical expertise required was "somewhat akin" to what he had been doing for many years. He developed a water tachometer that measured water speed by means of a propeller that counted revolutions; as the boat traveled, water turned a paddle wheel, causing a signal to be sent along a wire to a meter head that measured speed. Overs first tested the unit in a washtub, then on a small fishing boat in a harbor. But because his first unit only measured speeds up to two miles per hour, he considered it a failure.

Overs kept experimenting. Eventually he came up with a "turbine type system" that provided more accurate speed measurement. He also developed a housing that enclosed the propeller so it could pass through seaweed and debris without becoming tangled. Overs protected his invention by obtaining a patent from the U.S. Patent Office, and with a small business association loan formed his own company, Electro–Marine. He subcontracted the parts needed to manufacture boat speedometers and assembled those parts in his basement with help from his wife and children. In 1971 he began selling the speedometers to distributors; he expanded his market by attending boat shows and advertising in magazines throughout the United States. EMS, a company that started in Overs' basement, continued to grow, to employ more workers, and to build electronic boat speedometers used by customers for many purposes.

For 13 years, plaintiff John B. Wilson worked full-time for a company that manufactured heavy-duty trailers for hauling construction equipment. But his passion was fishing. He especially loved trolling, which involves towing live or artificial bait on a fishing line behind a slow-moving boat. Even a slight increase or decrease in the speed of the boat affects the action of the lure, making accurate measurement at low speeds essential for successful trolling. In 1978 Wilson purchased a speedometer from EMS that measured speed in tenths of a knot and ranged from zero to 12 knots. Wilson decided that speedometer was ineffective for trolling because it did not register minute changes in speed. He called EMS in the summer of 1979 and spoke with a plant engineer about modifying the unit; the engineer showed no interest in Wilson's inquiry. Wilson called back in the spring of 1980, speaking this time to plant manager Jonathan Sentz.

Wilson told Sentz he was using an EMS unit that measured speed from zero to 12 knots. He asked if EMS had anything that measured speed in miles per hour and was extremely reliable at low speeds. Sentz said EMS had nothing like that "off the shelf," but that he would modify an existing speedometer to Wilson's specifications. Sentz then sent Wilson a speedometer calibrated 1 to 6 miles per hour and segmented in thirds of a mile per hour. Wilson was not satisfied; this speedometer was too accurate—it measured the slightest changes in speed, including when the boat hit a wave. Wilson asked Sentz if he could change the way the unit reacted, and Sentz told Wilson EMS could "dampen" the speedometer to deaden its reaction to waves and other tiny changes in speed. Wilson thought this change brought him "closer to the solution," but requested that EMS send him three or four units with

different adjustments to be tested on the water. Sentz complied, and Wilson in April 1980 selected the one he liked most.

In May of 1980 Wilson wrote Sentz a letter requesting a unit to be built with a face showing zero to 6 miles per hour and segmented in thirds of a mile per hour. Wilson, apparently contemplating marketing the speedometers by himself, asked that the word "ACCU–TROL" be painted on the face of the unit, and told Sentz this would be used for advertising purposes. Around this same time he asked Sentz about exploring "the possibility of marketing a trolling speedometer." Sentz told him he would have to speak with Ronald Overs, Sr. Wilson remembers calling Overs and telling him: "I believe there is a real good market for trolling speedometers, especially in the Great Lakes area, and I would encourage you to enter that market and sell trolling speedometers. And I would like some consideration, maybe in the form of a royalty." Overs said he was not planning to undertake marketing of a trolling speedometer. However, Overs offered to provide Wilson with the product. Wilson agreed and decided to market the trolling speedometers as his own under the name "Pelican Trolling Speedometer." Wilson added no technical expertise to the development of the trolling speedometers. The changes Wilson requested were fairly simple—listing the speed in miles per hour instead of knots, calibrating the instrument in thirds of a mile per hour, color-coding the dials, and listing the speed from zero to 6 miles per hour—methods EMS had previously employed for other products. EMS provided all the technical expertise necessary for adjustments to the speedometers.

In the meantime (presumably sometime in 1980 during the initial negotiations between Wilson and EMS) Overs and Sentz discussed the possibility of marketing their own trolling speedometers, in particular a combination low-speed/high-speed speedometer similar to those ordered by Wilson. Sentz told Overs that he and Wilson had discussed that speedometer as part of a line Wilson hoped to market through Pelican. Overs told Sentz to go ahead with development, and that if anyone asked he should tell them it was only for saltwater use. Pursuant to Overs' request, Sentz developed and tested a prototype of such a unit in Florida over the winter of 1980–81. In July of 1981, while EMS was developing its "Kingfish" trolling speedometer, Wilson and his family visited the EMS plant. Overs instructed Sentz to be sure no dial faces or literature about the Kingfish were "laying around the plant" when Sentz gave the Wilson family a tour.

On September 7, 1980, Wilson ordered 1,000 speedometers from EMS at $75 each. Wilson intended to market the speedometers on his own. During the spring of 1982, after a year or more of timely deliveries, Wilson had fallen behind on payments to EMS. Consistent with its policy of not shipping to customers with overdue invoices, EMS delayed shipments. Despite slow payment and Wilson's occasional refusal to accept delivery of all units ordered, Overs considered Wilson a good customer and usually kept up deliveries unless Wilson was substantially behind in payment.

Wilson's speedometers were encased in pods supplied by a company known as Du–Bro products. In 1982 Ron Overs Jr., Ron Sr.'s son and a salesman for EMS, asked Wilson if EMS could use some pods and bracket assemblies to display an EMS product at a boat show. Wilson supplied approximately a dozen pods which EMS used to display its "Kingfish" trolling speedometer at boat shows. Overs Jr. later called Wilson and indicated that EMS would like to buy more pods from the company that supplied Wilson, so Wilson gave him the company name and a person to speak to about buying pods. EMS for a time ordered its Kingfish pods from Du–Bro Products, but later found a less expensive vendor.

In 1981 Gerald Marion, a self-employed sales representative in the fishing and marine industry, began selling Wilson's line and in January 1982 became Wilson's sole sales representative. But Marion was experiencing problems selling the Pelican because of its limited product line. Also, the wholesale price for the Pelican was $140 while the comparable EMS speedometer

cost $78. He was unable to obtain a written agreement regarding his position as sales representative for Wilson. Thus in May of 1983 he contacted Overs about becoming a sales representative for EMS.

Wilson first discovered that EMS was producing its own line of trolling speedometers in August of 1983 when EMS offered to sell Wilson a completely assembled speedometer—already mounted into a pod—for only $73, less than the $75 EMS had been charging Wilson just for the instrument head and the transducer portion of the unit. Wilson refused this offer, and stopped buying from EMS, although EMS never refused to sell to Wilson.

According to Overs and Sentz, other companies made dual-speed speedometers as early as 1978. By 1982, there were several other companies competing with EMS in selling trolling speedometers, including Data Marine, S.R. Mariner, Kenyon, Omni, Signet and VDO. In December of 1981 EMS began selling trolling speedometers to customers in addition to Wilson.

Eventually Wilson sued EMS for: 1) breach of contract, alleging that EMS entered into a covenant not to compete with him; 2) misappropriating trade secrets; 3) copyright infringement for use of information from a "Fisherman's Preferred Lure Speed Chart" that Wilson paid someone to prepare; 4) unfair competition; 5) antitrust violations; and 6) punitive damages. The district court granted summary judgment for EMS on the trade secret, contract and antitrust counts and a directed verdict for EMS on the copyright, unfair competition and punitive damages counts. Wilson appealed all but the antitrust ruling. We shall examine each claim in turn.

## II. Analysis

### A. Breach of Contract

Wilson's breach of contract claim is based on three pieces of evidence: his own testimony about his initial conversation with Overs; Wilson's September 1, 1980 letter to EMS stating that his bank needed assurance that EMS would market the speedometers only through him; and the affidavit of Jonathan Sentz, EMS' plant manager, expressing his belief that EMS had agreed not to compete with Wilson in the trolling speedometer market. Wilson argues these communications add up to a contractual agreement that EMS would not compete with Wilson in the trolling speedometer market. The district court granted summary judgment for EMS, finding no genuine issue of material fact. We review the record in the light most favorable to Wilson, the non-moving party. *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 937 (7th Cir. 1989).

■■■ The district court, applying Illinois choice of law principles, concluded that New York or Illinois substantive law applied to this question, but that the principles of both states regarding covenants not to compete were comparable. *See Sarnoff v. American Home Products Corp.*, 607 F.Supp. 77, 81 (N.D.Ill.1985). Neither brief addresses the question of which state's law should apply. We agree with the district court that both states require that noncompetition covenants are enforceable only when they are reasonable in geographic scope and duration, necessary to protect legitimate interests such as maintenance of trade secrets or goodwill, not harmful to the general public or unreasonably burdensome to the restricted party. *See Business Intelligence Services, Inc. v. Hudson*, 580 F.Supp. 1068, 1071 (S.D.N.Y.1984); *Reed, Roberts Associates, Inc. v. Strauman*, 40 N.Y.2d 303, 386 N.Y.S.2d 677, 680, 353 N.E.2d 590, 593 (1976); *Dryvit System, Inc. v. Rushing*, 132 Ill.App.3d 9, 87 Ill. Dec. 434, 437, 477 N.E.2d 35, 38 (1985). Before reaching those elements, however, there must be evidence that the parties intended to form a contract. *See A/S Apothekernes Laboratorium v. I.M.C. Chemical*, 873 F.2d 155, 157 (7th Cir.1989). Here again we agree with the district court that the evidence does not establish the formation of a covenant not to compete. While Wilson and Sentz may have believed such an arrangement was in place, there is no evidence that EMS agreed to a covenant not to compete. Overs' statement that he was too busy to compete was merely an indication of his present thoughts on the

matter. He said nothing that bound him to noncompetition in the future, and Wilson gave no consideration for such a promise. Wilson's letter to EMS merely describes his financing relationship and notes the bank's desire for some assurance from EMS that Wilson's company would be the sole distributor; there is no evidence that EMS agreed. And the Sentz affidavit merely sets forth Sentz' mistaken understanding of the relationship between EMS and Wilson. Without any evidence that Overs and EMS entered into a covenant not to compete with Wilson, the district court properly granted summary judgment.[1]

### B. Trade Secrets

Wilson argues that the district court's summary judgment analysis of the misappropriation of trade secrets count was flawed because the court considered only the general use of an EMS speedometer for trolling by fishermen. On appeal Wilson contends the court should have considered all of the following items as trade secrets developed by Wilson and misappropriated by Overs and EMS:

"(1) A 0–6 mile per hour refined prototype 12 Volt trolling speedometer with a specific amount of damping, tested and selected by plaintiff against three others;

(2) A dual range trolling speedometer with low speed for trolling and high speed for running;

(3) A water surface temperature sensor and readout;

(4) A sonar depth sensor and readout;

(5) A unique plastic pod and top dash mounting for a trolling speedometer;

(6) A customer list which was misappropriated by Overs and associates when they hired Marion away from Wilson;

(7) A 'Fisherman's Preferred Lure Chart' developed at Wilson's expense which was given Overs and associates, and it was later used in their promotional literature;

(8) The lead time owned by Wilson which was misappropriated and used to run Wilson out of business by Overs;

(9) A marketing plan for a complete line of trolling instruments."

■ The district court applied Illinois choice of law rules to conclude that in misappropriation of trade secrets cases, the law of the place where the alleged wrong was committed or benefit was obtained applies. *Goldberg v. Medtronic, Inc.,* 686 F.2d 1219, 1225 (7th Cir.1982). EMS maintains its principal place of business in New York, and would have obtained any benefit there, so New York law applies.

■ New York law describes a trade secret as "any device 'which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.' " *Eagle Comtronics, Inc. v. Pico, Inc.,* 89 A.D.2d 803, 453 N.Y.S.2d 470, 472 (1982) (citing Restatement of Torts § 757, comment (b) (1937)). Courts must consider several factors in determining whether a trade secret exists: the extent to which the information is known outside the plaintiff's business; the extent to which it is known by employees and others involved in the business; the extent of measures taken by the plaintiff to guard the secrecy of the information; the value of the information to him and his competitors; the amount of effort or money expended developing the information; and the ease or difficulty with which the information could be properly acquired or duplicated by others. *Id.* Further, the plaintiff must demonstrate that his idea is "novel." *Santilli v. Philip Morris & Co.,* 283 F.2d 6 (2d Cir.1960).

We take issue with Wilson's contention that the district court failed to consider all the elements of a trade secret he believes were misappropriated. The district court stated in its memorandum opinion granting summary judgment that

[p]laintiff alleges that the defendants misappropriated trade secrets *including* the 0–6 mile per hour refined prototype 12–volt trolling speedometer *and improvements to that speedometer* such as

---

**1.** The district court alternatively concluded that, under either New York or Illinois law, the supposed covenant not to compete was unenforcea- ble because it was not specific as to geographic and time limitations. We need not reach this issue.

a dual speed range, a water temperature sensor, a sonar depth sensor and read-out, self-power, and a new plastic pod and top-dash mounting bracket. (Emphasis added.)

■ The district court clearly took into account all of Wilson's efforts to improve the speedometer, along with other evidence, and concluded as we do that no evidence supports the trade secret claim. Wilson admits he called two other boat speedometer manufacturers and explained his idea to them before EMS agreed to produce the requested speedometer. He took no measures to guard the secrecy of his information either from other boat speedometer manufacturers or from other EMS employees. By the time EMS began selling trolling speedometers, two other companies were in the same business. While Wilson spent some time and money testing the product, it was EMS' labor and expertise that put the speedometer together. Trial testimony made clear that the adjustments Wilson claims were trade secrets were quite easily made, and presumably were easy to duplicate. Further, Wilson's "idea" could not be considered novel when articles were published as early as 1978 in fishing publications about the use of EMS speedometers for trolling.[2] Viewed in the light most favorable to Wilson, the record as we have it does not reveal a genuine issue of material fact, and the district court properly granted summary judgment for EMS on the misappropriation of trade secrets count.

*C. Copyright Infringement*

■ Wilson argues that EMS infringed his copyright in a "Fisherman's Preferred Lure Speed Chart." The district court found that the chart was not an original work entitled to copyright protection, and that no evidence was presented to support Wilson's contention that EMS used the chart following Wilson's acquisition of an interest in the copyright. Thus the district court granted a directed verdict for EMS on this issue at the close of Wilson's evidence.

Wilson received a handwritten lure speed chart from Bob Shayne, a charter boat captain, in the spring of 1982. The chart set out the most effective speeds and lures for catching brown trout, rainbow trout, lake trout, coho salmon and chinook salmon at different times of the year. Wilson copied the chart verbatim in typewritten form and distributed about a dozen copies to various people, including Overs. Later in 1982 Wilson gave the original handwritten chart to Larry Sawallich, who developed the "Fisherman's Preferred Lure Speed Chart." Sawallich included in the new chart all of Shayne's information and also information on catching walleye and muskies. Sawallich obtained a copyright on his chart in 1982, but did not sell Wilson a half-interest in the chart until January 25, 1985. EMS used some of the information from the chart as a small "Preferred Lure Speed Chart" in booklets it published in 1984 and 1985, entitled "Trolling, Speed Plus!" and "EMS High Quality Trolling Instruments."

The standard for reviewing a district court's grant of summary judgment is for this court to view all the evidence in the light most favorable to the appellant. *Smith v. Firestone Tire and Rubber Co.,* 875 F.2d 1325 (7th Cir.1989). The district court correctly ruled that Wilson failed to establish use by EMS of the allegedly protected information following Wilson's acquisition of the copyright in late January of 1985. ("The legal or beneficial owner of an exclusive right under a copyright is entitled ... to institute an action for any infringement of that particular right committed *while he or she is the owner of it."* 17

---

**2.** The parties stipulated to the jury that if a witness named Al Tyrrell were called to testify he would state that: 1) he was an avid fisherman with an interest in trolling on the Great Lakes; 2) at a boat show in 1977 he purchased a boat speedometer manufactured by EMS; 3) he mounted the unit on his fishing boat and found it helpful for trolling on the Great Lakes; 4) he

wrote an article in 1978 about using sail boat speedometers for trolling purposes that was published in the newsletter "Blue Water Chapter of the Michigan Steelheaders," and republished in the November 1978 issue of the "Great Lakes Steelheader," a fishing publication with a circulation of 11,000.

U.S.C. § 501(b), (emphasis added).) Further, Wilson fails to address the district court's conclusion that the chart is not an original work entitled to copyright protection. A passing remark in his reply brief that this conclusion is "spurious" is insufficient to preserve his objection to a holding of the district court; the issue is waived and we can affirm on that basis. *Reynolds v. East Dyer Development Co.*, 882 F.2d 1249, 1253 n. 2 (7th Cir.1989) (improper to make arguments for the first time in the reply brief); *U.S. v. Adamo*, 882 F.2d 1218, 1232 n. 11 (7th Cir.1989) ("... this court will not consider issues raised for the first time in a reply brief ..."). In any event, the evidence is uncontroverted that Shayne gathered the data and Sawallich copyrighted the chart. "If the disputed work is similar to a pre-existing protected work or one in the public domain, the second work must contain some variation recognizable as that of the second author." *Toro Co. v. R & R Products Co.*, 787 F.2d 1208, 1213 (8th Cir.1986) (citations omitted). Wilson did not contribute anything original to the work, which already existed to some degree in the public domain. There was no evidence that the chart was the "tangible expression" of Wilson's ideas, or "the product of plaintiff's intellectual invention." *Toro*, 787 F.2d at 1212–13. The district court was correct to direct a verdict for EMS on this count.

### D. Unfair Competition

The district court allowed only the unfair competition count to go to the jury, which found in favor of Wilson and awarded him $185,000 in damages. The court then granted a directed verdict on this count for EMS, holding that the evidence failed to support several essential elements of Wilson's unfair competition claim.

■ Our standard of review in a case where a directed verdict is granted after trial to nullify the verdict of a jury—essentially a judgment notwithstanding the verdict—is *de novo*. *DeRance, Inc. v. Pai-*

*neWebber Inc.*, 872 F.2d 1312, 1320 (7th Cir.1989). We are to sit in the place of the trial court and closely examine the record to determine whether "substantial evidence" supports the jury's verdict. *Id.*

As he did in his other arguments on summary judgment and directed verdict, Wilson here is urging that the district court's grant of the directed verdict in favor of EMS is unsupported by or contrary to the evidence. Yet his failure to provide all relevant transcript pages makes our task difficult, because we have no basis (other than the briefs, appendices and district court memorandum opinions) for reviewing the district court's conclusions about the evidence.[3]

■ Rule 10 of the Federal Rules of Appellate Procedure describes "The Record on Appeal," and Rule 10(a) makes clear that "the transcript of proceedings, if any" is a part of that record. Under Fed.R. App.P. 10(b), the appellant—in this case Wilson—is responsible for making sure that transcript pages are transmitted to the court of appeals, especially if those pages are necessary to his argument:

(1) Within 10 days after filing the notice of appeal the appellant shall order from the reporter a transcript of such parts of the proceedings not already on file as the appellant deems necessary ...

(2) If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant shall include in the record a transcript of all evidence relevant to such finding or conclusion.

This court has the power to sanction the appellant or even to dismiss the appeal because of this violation of the Federal Rules. *See, e.g., Fisher v. Krajewski*, 873 F.2d 1057, 1060–61, 1068–69 (7th Cir.1989). Because the briefs are mostly in agreement

---

**3.** The only portion of transcripts submitted by Wilson involve the testimony of Gerald Marion, a witness for Wilson. Wilson therefore violated Fed.R.App.P. 10(b)(3), which provides that if a partial transcript is ordered, the appellant must give notice to the appellee so the appellee has a chance to order up any part of the transcript he believes necessary to his arguments.

on the evidence presented but differ about the law, we will proceed with our analysis.[4]

■ The law of unfair competition, as with many equitable doctrines of primarily judicial creation, is elusive;[5] its elements escape definition so frequently that commentators occasionally find it necessary to produce law review articles with titles like "What is Unfair Competition?"[6] Perhaps the doctrine is misnamed; some would argue that competition is almost never unfair. *See generally* Friedman, *Capitalism and Freedom* (1962). Nevertheless, a body of law has evolved around the theory that at times business competitors engage in activity which, while perhaps not actionable under other commercial tort theories, so "shock[s] judicial sensibilities" or violates "standards of commercial morality" that it cannot be tolerated. *Margarete Steiff, Inc. v. Bing*, 215 F. 204 (D.N.Y.1914); *People ex rel. Mosk v. National Research Co.*, 201 Cal.App.2d 765, 20 Cal.Rptr. 516 (3d Dist. 1962). We have no inclination to add to this confusion by applying our own standards of fairness; instead we will follow the district court's lead by looking to Supreme Court precedent and the better developed caselaw from the state of New York.[7]

Unfair competition originally was an extension of trademark law, and was limited to circumstances in which a competitor was "passing off" or "palming off" the product of another as his own. Callmann, Unfair Competition, Trademarks and Monopolies § 2.01–2.02 (1981). The landmark Supreme Court case of *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), expanded the parameters of unfair competition beyond "palming off" by refusing to "concede that the right of equitable relief is confined to that class of cases," although those cases were still the most common. 248 U.S. at 241–42, 39 S.Ct. at 73. Some courts, including those in New York, took the lead and rejected similar attempts to dismiss unfair competition claims that did not allege any "palming off." *See e.g. Metropolitan Opera Association v. Wagner–Nichols Recorder Corp.*, 199 Misc. 786, 101 N.Y.S.2d 483 (N.Y.Sup.Ct.1950). Although not limited in that respect, New York courts have applied some concrete limiting standards to unfair competition cases since *International News Service*. As the Second Circuit explained in 1980, "The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another.... Central to this notion is some element of bad faith." *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980) (citations omitted). It is not sufficient for plaintiffs to show that a defendant's action is "unfair"—"New York law in this area is indeed flexible, but it is not that flexible." *Id.* Thus New York courts have required a showing

4. Since the appellant carries the burden to provide transcripts he must suffer the cost of their absence. Any evidence presented to the district court that might have provided support for Wilson's claims, but that is not set out in the briefs or opinions, cannot and will not be considered. The evidence that is indisputably before us, however, will of course be viewed in the light most favorable to Wilson.

5. "Because there is no clear concept of unfair competition, there is no clear theory of unfair competition." Callmann, Unfair Competition, Trademarks and Monopolies, § 2.02, Ch. 2 at 5 (1981). See also McCarthy, Trademarks and Unfair Competition, § 1.3–1.4, at 12, 14 (1984):

   The very term used to label the whole area—'unfair competition'—reveals the absence of any overall definite standard.... One has only to read a few judicial opinions to recognize the semantic quagmire which awaits the lawyer or judge who attempts to give a precise definition to that evasive concept called 'unfair competition.' ... The point is that Judges, when asked to expand the limits of unfair competition law, revert to their own conceptions of what is fair and honest.

6. Callmann, 28 Geo LJ 585 (1940).

7. The district court ruled that the forum state, Illinois, has adopted a "most significant relationship" test for choice of law in tort cases. *Ingersoll v. Klein*, 46 Ill.2d 42, 262 N.E.2d 593 (1970). The contacts divide evenly between New York, where EMS is located, and Michigan, where Wilson resides and works. The location of the defendants' place of business is given greater weight, *Data Cash Systems, Inc. v. JS & A Group, Inc.*, 480 F.Supp. 1063, 1071 (N.D.Ill. 1979), so the district court applied New York law on unfair competition. Neither party objects to the application of New York law.

(1) that the defendant obtained access to the idea through an abuse of a fiduciary or confidential relationship with the plaintiff or via some sort of fraud or deception ... and

(2) that the defendant's use of the idea deprived the plaintiff of the opportunity to reap its due profits on the idea....

*Werlin v. Reader's Digest Ass'n, Inc.*, 528 F.Supp. 451, 464 (S.D.N.Y.1981) (citations omitted).

With these admittedly subjective standards in mind, we turn now to Wilson's allegations regarding his relationship with Overs and EMS. Our task is to determine whether the district court properly concluded that there was not substantial evidence to support the jury's verdict on the unfair competition count.

Wilson alleges that Overs and EMS took advantage of their confidential relationship to appropriate Wilson's expenditures, labor, skill and knowledge. Wilson suggests the evidence shows he was taken advantage of in the following ways:

"(A) The plaintiff had significant knowledge of the use of boat speedometers along with significant knowledge of lure speed as it related to trolling for fish; (B) The plaintiff had a substantial investment in the research and development of the design of the speedometer dial face, pod mold and information contained in the lure speed chart, as well as a marketing plan for a complete line of trolling speedometers; and

(C) By appropriating such expenditures, labor and knowledge, the defendants unfairly gained an advantage which included taking away plaintiff's market lead time for Pelican products, the customer list known by and embodied in Jerry Marion, and Wilson's plan for a complete line of trolling speedometers."

We must view the evidence in the light most favorable to Wilson. *DeRance, Inc. v. PaineWebber Inc.*, 872 F.2d at 1320. Wilson argues that the following evidence supports the jury's verdict: 1) Wilson had an understanding that EMS would only sell trolling speedometers to him; 2) EMS covered up the fact that it was preparing to compete with him; 3) EMS used information Wilson provided confidentially for its lure speed chart; 4) EMS delayed shipping product during peak season to disrupt Wilson's business; 5) EMS stole Wilson's sales representative and his "walking customer list"; 6) EMS stole Wilson's pod design; 7) EMS stole Wilson's property interest in "lead time"; and 8) EMS used Wilson's research and development in marketing its own line of trolling speedometers.

We agree with the district court's decision to grant a directed verdict for EMS; substantial evidence does not support the jury's verdict that EMS engaged in unfair competition. This is clearly not a case where one party reaps where another has sown. Wilson can be credited for coming up with a good marketing scheme, and perhaps suggested to EMS a market it had to that point not considered. And certainly EMS could have been more straightforward in dealing with Wilson. Nevertheless, lack of fortitude in facing an angry but misguided customer does not equate to fraudulent "misappropriat[ion] of the labor and expenditures of another." *Saratoga Vichy Spring Co.*, 625 F.2d at 1044.

As the evidence at trial made clear, Wilson did not provide any technical expertise in the development of the trolling speedometer. The low-speed speedometer was developed by Overs and EMS. Any changes made to EMS speedometers at Wilson's request were made with EMS labor and skill. Further, Wilson did not develop the idea of using low-speed speedometers for trolling. Al Tyrrell had already written an article about the subject while using an EMS speedometer. As for "lead time," by the time EMS entered the market a number of other competitors were already producing trolling speedometers.

As already discussed in the breach of contract count, EMS never agreed to not compete with Wilson. Wilson's unilateral beliefs cannot bind EMS. The evidence (or what we know of it) also makes clear that there is no merit to Wilson's contentions that EMS stole his sales representative and deliberately delayed shipments during Wilson's peak sales periods. Gerald Marion

left Wilson and sought out the position of sales representative for EMS because he was having difficulty selling Pelicans and because of personal problems with Wilson. EMS only delayed shipments to Wilson when he fell seriously behind on invoice payments. EMS wanted Wilson to succeed and considered him a valued customer. Wilson stopped buying from EMS; EMS did not want to stop selling to Wilson.

Wilson also did not prove he had a proprietary interest in the Du–Bro pods. In fact, Du–Bro later sold those same pods directly to EMS. As the district court found, "pods of this type were commonly found in the industry and were certainly no secret. Nothing in this record suggests that the plaintiff originated the concept of housing the electronic parts of a speedometer in a casing called a pod or that he had otherwise acquired some right to prevent others from buying these on the open market without paying him a royalty."

The lure speed chart was developed by one man and copyrighted by another. Wilson's purchase of a half-interest in the copyright seems like a tardy attempt to preserve his right to information already in the public domain. Wilson gave the information on the lure speed chart to EMS; there is no evidence that he asked EMS not to use it.

Wilson at times seems to suggest that EMS was trying to "palm off" the Kingfish as the Pelican—bringing it within the traditional understanding of unfair competition. This charge lacks any support in the record as it has been presented to us. The district court properly granted EMS' motion for directed verdict on the unfair competition count.

### E.  Punitive Damages

Wilson alleged in his complaint that "the acts and conduct of the defendants herein have been motivated by express malice and with the express intention of deliberately and maliciously injuring the plaintiff's business and property. That the acts of defendants toward plaintiff herein were intentional, wanton, malicious and oppressive." In light of our discussion of the facts of this case and our disposition of the primary counts, it should be clear that the district court correctly granted EMS' motion for directed verdict on this count. Without recovering compensatory damages on any of the underlying substantive counts, Wilson is not eligible for punitive damages.

### III.  Conclusion

As the district court concluded:
The defendants had a right to market a competing trolling speedometer so long as they did not use the labors and expenditures of the plaintiff as their own. The evidence established that ... the defendants' [used their] own skills, labor and expertise [to compete] with the plaintiff. This they were free to do.

The judgment of the district court is therefore

AFFIRMED.