**FEDDERS CORPORATION, Plaintiff,**

v.

**ELITE CLASSICS and Cheston Knight, Defendants.**

**Elite Classics, Cheston Knight, and Star Elite, Counter–Claimants,**

v.

**Fedders Corporation and Robert Edwards, Counterclaim Defendants.**

No. 03–CV–4003.

United States District Court, S.D. Illinois.

May 1, 2003.

1054

Charles L. Joley, Georgiann Oliver, Donovan, Rose et al., Belleville, IL, Constance S. Huttner, Stephanie J. Kamerow, Scott D. Brown, Jonathan M. Seiden, Skadden, Arps, et al., New York City, for Fedders Corporation, plaintiff.

Frederick J. Hess, Lewis, Rice et al., Belleville, IL, Lynn H. Murray, James P. Gitzlaff, Grippo & Elden, Chicago, IL, Edward D. Manzo, Attorney at Law, Chicago, IL, for Elite Classics, Cheston Knight, defendants.

### ORDER

GILBERT, District Judge.

This matter comes before the Court on two motions: (1) for preliminary injunctive relief by the plaintiff, Fedders Corporation, against the defendants, Elite Classics and Cheston Knight (Doc. 22), and (2) for

preliminary injunctive relief by the counter-claimants, Elite Classics, Cheston Knight, and Star Elite, against the counterclaim defendants, Fedders Corporation and Robert Edwards (Doc. 16). The motions have been fully briefed. On April 22, 2003, this Court conducted an evidentiary hearing on the motions. For reasons discussed below, the Court will deny both motions for preliminary injunctive relief.

### BACKGROUND

Fedders is in the business of manufacturing, among other things, a line of room air conditioner units—the "Chassis" line of air treatment products. The Chassis line includes several types of units of various sizes, including the X Chassis, T Chassis, Q Chassis, J Chassis, and D Chassis. Fedders's Chassis line is sold under the Maytag and Emerson brands as well as under the Fedders brand. In its complaint, Fedders alleges that each type of Chassis line unit sold under the Fedders brand features a "distinctive trade dress," consisting of, among other things, an "undulating curve on the left or right of the faceplate separating the portion of the faceplate on which the controls are positioned from the air intake louvers." *Complaint*, ¶ 13(i) (Doc. 1). Only the Fedders brand models have the aforementioned "undulating curve" on their face plate.

Additionally, Fedders alleges that the design of its X–Chassis unit, Fedders's smallest room air conditioner, includes several innovative features. The allegedly innovative features include: (1) the overall size and shape of the unit, (2) the design and placement of the bulkhead, coils, fan shroud, motor and controls, (3) the honeycomb design of the back grille, (4) the fact

that the back grille is made from plastic, and (5) the expanded polystyrene ("EPS") bulkhead enclosure.[1] According to Fedders, these allegedly innovative design features resulted in the X Chassis being lighter and more reliable than competitive room air conditioners.

Fedders alleges that it "has expended substantial amounts of time and money researching, developing, and marketing its novel X Chassis air conditioner." *Complaint*, ¶ 16 (Doc. 1). It is undisputed that Fedders engineers in Effingham, Illinois designed many of the internal components of the X Chassis. Fedders contracted with various Chinese corporations for the mass manufacture of the components of the X Chassis. For example, Fedders contracted with Broad Ocean Motors for the assembly of the motor and with Ningbo–LES for the manufacture of the EPS bulkhead enclosure. Fedders also has a joint venture with a Chinese company in Ningbo, China—the Fedders–Xinle facility, referred to in the record as the FX facility. And, Fedders has a manufacturing facility in Shanghai—"Fedders Shanghai." Both Fedders Shanghai and the FX facility contributed to the manufacture of the X Chassis.

Room air conditioners are typically sold to consumers through large retail distributors like Home Depot, Wal–Mart, and K–Mart. The X Chassis units, including those sold under the Fedders brand, were first marketed to retailers in 2000 and were introduced to consumers in the summer of 2001.

On January 9, 2003, Fedders filed suit in this Court against two entities Elite Classics and Cheston Knight.[2] Elite is a Cana-

---

1. EPS is a lightweight rigid foam material, comprised mostly of air. It is most commonly used as insulation. On the X Chassis, the three-piece EPS enclosure surrounds the blower wheel and other bulkhead parts.

2. Fedders alleges that Cheston Knight is a wholly owned subsidiary of Elite and that Cheston Knight manufactures and markets room air conditioner units. *Complaint*, ¶ 6 (Doc. 1). Elite denies that allegation, *Answer*

dian corporation, which markets various products (including light bulbs, small refrigerators, and air conditioners) under the Sunbeam label—through a licensing agreement with Sunbeam Products, Inc. Apparently Elite does not sell anything under its own brand and does not manufacture anything. Rather, Elite obtains agreements with companies, such as Sunbeam, for the use of their brand on a new product and, in turn, contracts with third-party manufacturers (usually in China) for the manufacture of that product.

In February 2002, Elite expanded its license agreement with Sunbeam to include room air conditioners. Thereafter, Elite reached an agreement with Hi–Con, a Chinese-based appliance assembler, to manufacture a room air conditioner. The result of this agreement was a 5200 BTU "Sunbeam" air conditioner that reached the marketplace by the summer of 2002. Both Wal–Mart and K–Mart had ordered the Sunbeam air conditioners early in 2002.

In a nutshell, Fedders claims that the Sunbeam 5200 BTU air conditioner is a virtual copy of Fedders's X–Chassis, that the defendants have intentionally copied the X Chassis in order to reduce design time and eliminate design costs, and that, along the way, the defendants have committed certain civil wrongs. More specifically, Fedders alleges that the face plate of the Sunbeam air conditioner contains an "undulating curve" which is very similar to the curve that appears on the Chassis line air conditioners sold under the Fedders brand. Fedders contends that the similarity of the Sunbeam faceplate to Fedders's faceplate gives rise to a cause of action under § 43(a) of the Lanham Act and under certain Illinois statutes. Additionally, Fedders alleges that the defendants have

duplicated certain internal components of the X Chassis by somehow misappropriating designs and molds owned by Fedders. Fedders contends that the alleged misappropriation of designs and molds amounts to common law unfair competition.

Elite denies any wrongdoing. Specifically, Elite contends that its manufacturer, Hi–Con, purchases components on the open market from various manufacturers. Elite further contends that it has "obtained confirmation from each of those suppliers stating that the parts they supply to Hi–Con are not made using Fedders' proprietary molds." *Answer and Counterclaim,* ¶ 96 (Doc. 56).

Moreover, Elite, Cheston Knight and Star Elite ("the Elite Group") have filed a counterclaim against Fedders and Robert Edwards, Fedders's General Counsel. The Elite Group alleges that Fedders and Edwards have "engaged in a partern and practice of unfair competition and anticompetitive conduct designed to ruin the reputation of Elite Classics, Cheston Knight and Star Elite ...." *Answer & Counterclaim,* ¶ 62 (Doc. 56).

In a nutshell, the Elite Group alleges that they have been wrongfully disparaged by Fedders and Edwards in two communications: (1) a September 4, 2002 e-mail by Robert Edwards to Fedders executives that was allegedly distributed to certain retailers, and (2) a January 9, 2003 press release that is posted on Fedders's corporate web-site and that was also allegedly distributed to certain retailers. The September 4, 2002 e-mail stated in part, as follows:

> As you are aware, we are faced with an extremely serious situation where the designs, parts made with our tooling,

*and Counterclaim,* ¶ 6 (Doc. 56), and contends that Star Elite is "the current distributor of

Sunbeam air conditioners." *Id.,* ¶ 70.

and proprietary parts sourcing knowledge for one of our room air conditioners has been 'pirated.' These units are being sold in North America under the Sunbeam trademark. The goods are being manufactured in China and then distributed in North America through a company that is using the Sunbeam name, with or without its authorization. Our investigation of this matter to date has led to some disturbing conclusions. First, it is apparent that our molds have been used to make parts for the Sunbeam unit. The parts were treated with a chemical in a crude and ineffective attempt to mask our part numbers sometime after the parts came out of our molds. This was done without our knowledge or permission and constitutes a theft of our designs and tooling for use on unauthorized product. The "trade dress" of our product, its "look and feel" if you will, has been compromised.... We are convinced that we have more than enough evidence to proceed with an action to seek injunctive relief against the sale of this product, and Fedders is taking such action against the manufacturer and its agents without delay.

While Edwards only sent the e-mail to Fedders executives, he encouraged its addressees to "bring this matter to the attention of all concerned or potentially concerned parties." Elite alleges that copies of the e-mail reached retailers within days, and Fedders has admitted that the e-mail was distributed to retailers. About four months later, on January 9, 2003, Fedders filed this suit and published the aforementioned press release. Essentially, the press release summarizes the allegations contained in the complaint, referring to the allegations as allegations. The counter-claimants contend that these communications give rise to claims under the Illinois Uniform Deceptive Trade Practices Act and the Illinois Consumer Fraud and Deceptive Business Act and for defamation,

commercial disparagement, and intentional interference with prospective economic advantage. The counter-claimants contend that Fedders timed the filing of this law suit to coincide with the "critical mid-winter selling season." *Answer and Counterclaim,* ¶ 62 (Doc. 56).

Both parties have filed motions for preliminary injunctive relief. Fedders requests an injunction that does the following: (1) prohibits Elite from utilizing trade dress that is confusingly similar to the trade dress used on Fedders model A/C units, and (2) prohibits Elite from using Fedders parts or parts made from Fedders's proprietary molds. Elite has already implemented a change to the design of the face of its Sunbeam units, but about 12,000 units will not incorporate the new design. *See Supplemental Submission of Fedders,* (Tab H).

In seeking preliminary injunctive relief, Fedders has relied on two legal theories: (1) that the curve on the face of the Sunbeam unit infringes upon Fedders's "trade dress" in violation of Section 43(a) of the Lanham Act, and (2) that Elite's alleged misappropriation of Fedders's proprietary molds and/or designs constitutes common law unfair competition. Notably, Fedders has not relied on a theory of intentional interference with contract.

The Elite Group requests an injunction that does the following: (1) requires Fedders to remove the "press release" regarding this lawsuit from its website, (2) requires Fedders to issue an explanatory statement to all persons who received a copy of the press release and to publish the same explanation on its website, (3) prohibits Fedders from "disparaging" Sunbeam brand A/C units, and (4) prohibits Fedders from taking any action to disrupt the sale of Sunbeam brand A/C units. In seeking preliminary injunctive relief, Elite has relied on the Illinois Uniform Decep-

tive Trade Practices Act and the common law theories of defamation and intentional interference with prospective economic advantage.

Both parties have submitted numerous affidavits, declarations and exhibits for the Court's consideration. The hearing on this matter took a full day, and the Court heard testimony from several witnesses. The Court also had an opportunity to compare a Fedders X Chassis air conditioner to a Sunbeam 5200 BTU unit and to compare the fronts of both units to the fronts of models sold under other brands.

At the hearing, Robert Baumann, Fedders's Director of Engineering, testified that Fedders engineers spent about one-year designing the X Chassis model and that the model introduced certain innovative features, such as the EPS bulkhead. He testified that in the summer of 2002 Fedders acquired a Sunbeam 5200 BTU air conditioner by purchasing it from a Wal–Mart store in Effingham, Illinois. He testified that upon disassembly of the Sunbeam unit, he discovered that most of the parts were identical to parts designed by Fedders engineers for the X Chassis. Mr. Baumann demonstrated that, for the most part, parts are interchangeable between the X Chassis and the Sunbeam units.

Even a certain design flaw appears in both units. According to Mr. Baumann, due to a measurement error made by a Fedders engineer during the design of the EPS bulkhead enclosure, the top and bottom sections of the enclosure are slightly misaligned. This misalignment apparently does not affect the function of the air conditioner but certainly serves no purpose. The same misalignment appears in the Sunbeam unit.

Mr. Baumann further testified that he discovered Fedders part numbers on the EPS bulkhead enclosure and the motor in the Sunbeam unit. He testified that both parts had been designed by Fedders engineers specially for the X Chassis. He testified that there had apparently been some attempt to remove the part number from the EPS bulkhead but that the number could still be read. The Court had an opportunity to examine the Sunbeam unit that Mr. Baumann had disassembled, and the appearance of the air conditioner was consistent with Mr. Baumann's testimony.

David Nichols, Fedders's Vice President of Global Sourcing, testified about, among other things, Fedders's business interests in China. According to Mr. Nichols, thirty or forty manufacturers supply components for the X Chassis air conditioner, including Broad Ocean Motors (manufacturer of the motor) and Ningbo–LES (manufacturer of the EPS bulkhead enclosure). Mr. Nichols testified that it is the standard policy and practice of Fedders to require all manufacturers to execute non-disclosure agreements which prohibit the manufacturers from disclosing or sharing any confidential designs, molds or tools provided by Fedders. At the hearing, however, Mr. Nichols admitted that Fedders had been unable to find any such agreement with Ningbo–LES executed prior to the commencement of this litigation. Moreover, Fedders has never produced any relevant non-disclosure agreement that was in force prior to March 2002. At the request of Fedders, Broad Ocean Motors executed a non-disclosure agreement on March 19, 2002, and Ningbo–LES executed an agreement subsequent to the commencement of this litigation.

Mr. Nichols admitted that the non-disclosure agreements were handled by Fedders in a "haphazard" manner three and four years ago. Further, he admitted that he did not know which manufacturers of X Chassis components had executed non-disclosure agreements as of 2001. More specifically, Mr. Nichols testified that he did not know whether Ningbo–LES had exe-

cuted a non-disclosure agreement prior to the commencement of this litigation.

Mr. Nichols also testified that it is the standard policy and practice of Fedders to use a certain purchase order form when purchasing parts from Chinese manufacturers. Fedders has produced a copy of a March 23, 2000 purchase order issued by Fedders to Ningbo–LES for the production of certain molds needed to mass manufacture the EPS bulkhead enclosure. The purchase order provides, in part, as follows:

[A]ll special dies, molds, patterns, jigs, fixtures, specifications, drawings, designs and any other property furnished by [Fedders] to [the manufacturer], or specifically paid for by [Fedders], for use in connection with this order, shall be and remain the property of [Fedders]. [The manufacturer] agrees not to divulge or disclose such property and drawing, specifications, designs or other data to any person, form or corporation other than [Fedders's] or [the manufacturer's] employees.

According to Mr. Nichols, the same language appears in every purchase order issued by Fedders to Chinese manufacturers. Fedders has also produced a copy of a purchase order for the mass manufacture of the EPS bulkhead enclosure. The copy is in Chinese only, and Fedders has not provided a translation. Fedders admits that the copy does not contain the non-disclosure provisions but Mr. Nichols testified that the provisions were on the back of the original form. Nichols testified that Fedders has not taken any action against any of the Chinese manufacturers of X Chassis components.

Daniel Lavy, President of the Elite Group, testified at the preliminary injunction hearing. The gist of Mr. Lavy's testimony was that he asked Hi–Con to make an air-conditioner and that Hi–Con made

one. His testimony, in part, was as follows:

Q: What's your understanding of how Hi–Con went about designing or assembling an air conditioner for use under the Sunbeam name?

Lavy: My understanding today is a lot greater than it ever was before.

Q: That's important. What was your understanding before today about the way Hi–Con designed or assembled this air-conditioner?

Lavy: All they asked us to do was to send them a bunch of air conditioners that were in the marketplace which we did. We bought a bunch of air conditioners. They had air conditioners at their factory, too. And we sent it to them, and we told them to make us a 5200 BTU air conditioner.

Q: And did they do that?

Lavy: Yes.

Mr. Lavy also testified that when he received a copy of Robert Edwards's e-mail he contacted Hi–Con. He testified that he received assurances that Hi–Con was not using Fedders's parts and that Hi–Con was not purchasing components from any manufacturer that had an exclusive deal with Fedders.

## DISCUSSION

A. *Preliminary Injunction Standard.*

The party requesting a preliminary injunction has the burden of demonstrating: (1) a threat of irreparable harm without an adequate remedy at law; (2) some likelihood of success on the merits of the underlying claims; (3) a balance of relative harm weighing in favor of granting the injunction; and (4) compatability of the injunction and the public interest. *Chicago Bd. of Realtors, Inc. v. City of Chicago,* 819 F.2d 732, 735 (7th Cir.1987). "A preliminary injunction is an extraordinary

remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Chicago Dist. Council of Carpenters Pension Fund v. K & I Construction, Inc.*, 270 F.3d 1060 (7th Cir.2001).

## B. *Fedders's Motion for Preliminary Injunctive Relief.*

The Court will deny Fedders's motion for preliminary injunctive relief, because Fedders has not met its burden of showing a likelihood of success on the merits of any of their claims.

### 1. *Likelihood of Success on Trade Dress Claim.*

▮ Regarding its trade dress claim, the Court finds that Fedders has not demonstrated a likelihood of success on the merits, because Fedders has failed to put forward any evidence of "secondary meaning."

▮ The Lanham Act prohibits the use in commerce of any false designation of origin which is "likely to cause confusion, or to cause mistake, or to deceive" as to the origin or maker of goods. Fedders contends that the "undulating curve" that appears on the face of certain Fedders A/C units is a "trade dress" constituting a designation of origin under the Lanham Act. Fedders contends that by copying the curve, Elite has violated the Act.[3]

▮ Competitors are required to select a trade dress that will avoid a likelihood of consumer confusion. *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1155 (7th Cir.1994). A company entering

a field occupied by another has a duty to select a trademark that will avoid confusion. *Ty, Inc. v. The Jones Group, Inc.*, 98 F.Supp.2d 988, 993 (N.D.Ill.2000).

▮ Use of similar trade dress can be an infringement of the Act if: (1) the trade dress is "distinctive," either because it is "inherently distinctive" or has a "secondary meaning," and (2) there is a likelihood of confusion. *Wal–Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000) Determining whether trade dress is "distinctive" can be tricky. If the "trade dress" is part of the "product design," as opposed to mere packaging, then the trade dress is not "inherently distinctive." *Id.*

In this case, the key question is whether the subject trade dress—the undulating curve on the decorative front—is part of the product design or packaging. The defendants argue that the curve is part of the product design, and that, therefore, evidence of secondary meaning is required. On the other hand, Fedders notes that the curve is not functional, but rather, purely esthetic. Moreover, Fedders argues that the curve is a unique design that is associated with its Chassis line of air conditioners. Therefore, according to Fedders, the curve is "inherently distinctive," and no evidence of secondary meaning is necessary.

Relying on *Wal–Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000), the Court has concluded that evidence of secondary meaning is necessary in this case.

---

**3.** Fedders has not alleged that Elite has infringed upon a patent, copyright or *registered* trademark. Moreover, it is not illegal to "reverse engineer" a product design that is not patented. "In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying." *TrafFix Devices, Inc. v. Marketing Dis-*

*plays, Inc.*, 532 U.S. 23, 29, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001). "Copying is not only good, it is a federal right—a necessary complement to the patent system's grant of limited monopolies." *Thomas & Betts Corporation v. Panduit Corp.*, 65 F.3d 654, 657 (7th Cir.1995).

In *Wal–Mart*, a children's clothing designer, Samara, brought an action under § 43(a) against Wal–Mart for trade dress infringement. A jury returned a verdict in favor of Samara, and the district court denied Wal–Mart's motion for judgment as a matter of law. The Court of Appeals affirmed, but the Supreme Court reversed.

Samara had designed a line of children's clothing—"one-piece seersucker outfits decorated with appliques of hearts, flowers, fruits, and the like." *Wal–Mart*, 529 U.S. at 207, 120 S.Ct. 1339. Wal–Mart contracted with a supplier to manufacture a line of children's clothing, and the manufacturer copied the Samara design. The issue before the Court was whether Samara's trade dress could be considered "inherently distinctive" or whether a showing of "secondary meaning" was required in order to establish distinctiveness. *Id.* at 210–12, 120 S.Ct. 1339. The Supreme Court held that product design, as opposed to packaging or labeling, cannot be *inherently* distinctive. *Id.* at 213, 120 S.Ct. 1339. The Court stated, in part, as follows:

> In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source but to render the product itself more useful or more appealing.... Consumers should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves ....

*Id.* The Court acknowledged that there might be some close cases, in which the line between product design and product packaging would not be clear. *Id.* at 215, 120 S.Ct. 1339. The Court warned, however, that "courts should err on the side of caution and classify ambiguous trade dress as product design, requiring secondary meaning." *Id.*

In this case, the Court believes that Fedders's undulating curve is not "packaging", but rather product design. The curve serves a purpose other than to identify the maker. It serves the purpose of making the air conditioners more esthetically appealing.

 Fedders argues that the decorative front is not "functional"—that it does not affect how the air conditioner works. Fedder's argument is misguided. Functionality is not the test for distinguishing between packaging and product design. Rather, when a component is "functional," the question of whether secondary meaning is required is irrelevant because there can be no trade dress protection for a functional component. *Traf-Fix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 26, 33, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001). In other words, the question of whether "secondary meaning" is required will only arise in cases where the component in question is *non-functional*. Thus, for example, in this case, the clearly "functional" components on the X–Chassis (e.g., the EPS bulkhead enclosure and the motor) clearly cannot be protected as trade dress.

 Thus, to satisfy the first prong of its trade dress case—distinctiveness—the plaintiff will ultimately be required to establish that, in the minds of the public, the primary significance of the undulating curve on its Chassis line air conditioners is to identify Fedders as the maker. *Wal–Mart*, 529 U.S. at 211, 120 S.Ct. 1339; *see also Thomas & Betts Corporation v. Panduit Corp.*, 65 F.3d 654, 657 (7th Cir.1995) ("Trade dress protection only extends to the role of ... features as signifier of source ....").

■ To establish secondary meaning, courts consider "direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying." *Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 393 (7th Cir.1992); *Bretford Manufacturing, Inc. v. Smith System Manufacturing Co.*, 116 F.Supp.2d 951, 956 (N.D.Ill. 2000). Here, Fedders has relied on its argument that its trade dress is inherently distinctive and has offered no evidence of secondary meaning. Therefore, Fedders has not met its burden of showing a likelihood of success on the merits of its Lanham Act claim.

2. *Likelihood of Success on Common Law Unfair Competition Claim.*

■ The Seventh Circuit has stated that the common law of unfair competition is "elusive" its elements "escaping definition." *Wilson v. Electro Marine Sys., Inc.*, 915 F.2d 1110, 1118 (7th Cir.1990). "Unfair competition" was originally an extension of trademark law. *Id.* The theory, however, has been extended to cover any conduct that "shocks judicial sensibilities" and "violates standards of commercial morality." *Id.* The Court believes that Fedders has failed to put forward evidence that the defendants have engaged in such conduct. Therefore, the Court finds that Fedders has failed to demonstrate a likelihood of success on the merits of its common law unfair competition claim.

There is compelling evidence that certain components of the Sunbeam 5200 BTU air conditioner were made according to designs and with molds originally created by Fedders engineers for the X Chassis air conditioner. There is little doubt that Elite has benefitted from Fedders's investment in the X Chassis and the work of Fedders's engineers. However, the allegedly innovative X Chassis components were not protected by patents. While

Fedders alleges that its designs and molds are protected by non-disclosure agreements, Fedders does not allege that the defendants are parties to these non-disclosure agreements. Neither does Fedders allege that the defendants knowingly and intentionally induced the breach of these agreements. Fedders has inferred that Elite's Chinese manufacturer, Hi–Con, induced Fedders's Chinese manufacturers, Ningbo–LES and Broad Ocean Motors, to breach their agreements with Fedders. Fedders, however, has never explained why Elite should be held responsible for the conduct of any of the Chinese manufacturers.

C. *Elite's Motion for Preliminary Injunctive Relief.*

The Court will deny the counter-claimant's motion for preliminary injunctive relief, because they have not met their burden of showing a likelihood of success on the merits of any of their claims.

1. *Likelihood of Success on UDTPA Claim.*

■ Regarding the counter-claimants' UDTPA claim, the Court finds that the counter-claimants have not demonstrated a likelihood of success on the merits, because they have failed to establish that the UDTPA is applicable to the statements at issue. The UDTPA states in pertinent part:

A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person: ... (8) disparages the goods, services, or business of another by false or misleading representation of fact; [or] ... (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

815 ILCS 510/2. "The [UDTPA] does not provide a cause of action for damages, but

it does permit private suits for injunctive relief ...." *Greenberg v. United Airlines,* 206 Ill.App.3d 40, 150 Ill.Dec. 904, 563 N.E.2d 1031, 1036–37 (1990) (citation omitted). Essentially, the statute codifies the common-law tort of commercial disparagement. *See Crinkley v. Dow Jones & Co.,* 67 Ill.App.3d 869, 24 Ill.Dec. 573, 385 N.E.2d 714, 719 (1978). It provides a remedy for disparagement of a product. *See Roper Whitney, Inc. v. TAAG Machinery Co.,* No. 99 C 50032, 2003 WL 57029, at *2 (N.D.Ill. Jan. 7, 2003) (citing *Brown & Williamson Tobacco Corp. v. Jacobson,* 713 F.2d 262, 274 (7th Cir.1983)).

 "So long as the statements at issue do not disparage the quality of the plaintiff's goods or services, no cause of action will lie under [the statute]." *Roper Whitney,* 2003 WL 57029, *2 (citing *Allcare, Inc. v. Bork,* 176 Ill.App.3d 993, 126 Ill.Dec. 406, 531 N.E.2d 1033, 1037–38 (1988)). The statute is not applicable to a statement about whether a competitor has broken the law, and "statements that impute a want of integrity are not actionable under the UDTPA." *Republic Tobacco, LP v. North Atlantic Trading Co.,* 254 F.Supp.2d 985, 998 (N.D.Ill.2002). The statute only applies to statements that are false. *Richard Wolf Medical Instruments Corp. v. Dory,* 723 F.Supp. 37, 40 (N.D.Ill. 1989). In this case, the challenged statements are unrelated to the quality of the counter-claimant's products, and, therefore, the UDTPA is not applicable.

 Even if Fedders's statements were considered to be related to the quality of the Sunbeam air conditioner, the UDTPA would not be applicable. Fedders's press release merely provides notice that this suit has been filed and summarizes the allegations contained in the complaint. The mere notification of a pending lawsuit does not violate the UDTPA. *See Herman Miller, Inc. v. Teknion Furniture, Sys., Inc.,* No. 93 C 7810, 1996 WL

341541, at *3 (N.D.Ill. June 20, 1996) (notification of a pending patent infringement lawsuit did not violate UDTPA).

 As for the e-mail, it does not expressly accuse Elite or even "the company that is using the Sunbeam name" of any wrongdoing. Rather, the e-mail essentially states that Fedders's designs and molds have been "pirated" and that such copying, by whomever it was committed, was "theft." The e-mail does not lay blame upon the counter-claimants, and an equally reasonable interpretation of the e-mail would be that a Chinese manufacturer was responsible for the misappropriation.

Some statements in the e-mail are opinion, which cannot be labeled either true or false. Mr. Edwards opines, "I would not be surprised if additional evidence of wrongdoing is uncovered." This was clearly Mr. Edwards's opinion. Further, he states, "We are convinced that we have more than enough evidence to proceed with an action to seek injunctive relief against the sale of this product ...." Of course, Fedders has proceeded with an action seeking injunctive relief. To the extent that Mr. Edwards's statement is construed as a prediction of the outcome of an action seeking injunctive relief, he was only stating his opinion.

Moreover, there is evidence that other statements in the e-mail are true. As mentioned above, Mr. Baumann testified convincingly that many components of the X Chassis and Sunbeam units are interchangeable. For example, a design flaw which appears in the X Chassis (the misalignment of the upper and lower EPS bulkheads) also appears in the Sunbeam units. A Fedders part number appeared on the EPS bulkhead enclosure of the Sunbeam, although some attempt had been made to obscure the number. Moreover, Mr. Nichols testified that Fedders's Chinese manufacturers are generally required

by agreements and/or purchase orders to protect Fedders's molds, tools and designs. Fedders has produced a copy of a purchase order that apparently prohibited Ningbo–LES from divulging the designs and molds used to make the EPS bulkhead enclosure. All of this indicates that, in fact, Fedders's molds and/or designs were misappropriated. Although the counter-claimants may not be legally responsible for the misappropriation, Edwards's e-mail does not state that they are responsible.

### 2. *Defamation.*

The counter-claimants contend that Fedders's actions "constitute defamation *per se.*" *Brief in Support of Counter-Claimants Motion for Preliminary Injunctive Relief,* at 8 (Doc. 16). When, as here, the party alleging defamation *per se* is a corporation, the allegedly defamatory communication must "assail the corporation's financial or business methods or accuse it of fraud or mismanagement." *American Int'l Hosp. v. Chicago Tribune,* 136 Ill.App.3d 1019, 91 Ill.Dec. 479, 483 N.E.2d 965, 969 (1985). A statement is not libelous *per se* if it is substantially true, if it is not injurious on its face, if it is an expression of opinion, or if, taken in context, it is reasonably capable of an innocent construction. Because the counter-claimants are corporations, they must show actual malice, that is that the statements were made with knowledge of their falsity or reckless disregard for their truth. *Conseco Group Risk Management Co. v. Ahrens Fin. Sys.,* No. 00 C 5467, 2001 WL 219627, at *8–10 (N.D.Ill. March 6, 2001).

In this case, the press release is not defamatory. It truthfully summarizes the allegations contained in the complaint in this case. Moreover, Robert Edwards's e-mail is reasonably capable of an innocent construction. As discussed above, the e-mail does not expressly accuse the counter-claimants of any wrongdoing and some

statements in the e-mail are opinion. Also, there is evidence that the content of the e-mail is substantially true.

Finally, even assuming that the e-mail contains false factual assertions, the counter-claimants have not put forward any evidence of actual malice. On the contrary, the Court believes that the evidence discussed above indicates that Mr. Edwards had, at least, a good faith basis for believing the statements that he made in his e-mail.

### 3. *Intentional Interference with a Prospective Economic Advantage.*

To succeed on this claim, Elite must ultimately show: (1) the existence of a valid business relationship or expectancy; (2) the knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Galinski v. Kessler,* 134 Ill.App.3d 602, 89 Ill.Dec. 433, 480 N.E.2d 1176, 1180 (1985).

Under Illinois law, "[a] defendant is privileged to interfere with a competitor's relationship with a third party unless that party acted with malice, or utilized wrongful means." *Lychval Systems, Inc. v. Chicago Consulting Actuaries, Inc.,* 95 C 1490, 1998 WL 151814 (N.D.Ill. March 27, 1998). When a party makes both defamation and intentional interference claims, the two claims are "analytically intertwined." *Delloma v. Consolidation Coal Co.,* 996 F.2d 168, 172 (7th Cir.1993). (citing *Mittelman v. Witous,* 135 Ill.2d 220, 142 Ill.Dec. 232, 552 N.E.2d 973, 981 (1989)). True statements, "with or without privilege," are not actionable. *Delloma,* 996 F.2d at 172.

In this case, the press release is not actionable. It is merely a truthful summary of the allegations contained in the complaint. Regarding the e-mail, as discussed above, the Court believes that the statements in the e-mail are either true statements or opinion. Even if the e-mail contains false statements, Fedders has established that Edwards had a good faith basis for believing the statements to be true. Therefore, the communication is privileged. *See ABC v. Maljack Productions, Inc.,* 34 F.Supp.2d 665, 675 (N.D.Ill. 1998) (holding that right to warn others of a copyright infringement suit did not depend upon validity of copyright so long as the defendant had a good faith belief in existence of a valid copyright); *Publications International, Ltd. v. Western Publishing Co., Inc.,* 93 C 3074, 1994 WL 23008, *1 (N.D.Ill. Jan. 25, 1994) (same, discussing right to warn third parties of patent suit).

### 4. *Irreparable Harm.*

Assuming *arguendo* that the counter-claimants have shown that they are likely to succeed on the merits of one or more of their claims, they have not shown they will suffer irreparable harm in the absence of preliminary injunctive relief. Although Fedders's press release continues to be posted on Fedders's web-site, the press release merely truthfully summarizes the allegations contained in the complaint of this case. While Mr. Edwards's e-mail is arguably more troubling, it appears to be an isolated communication. With the exception of the press release, there is no evidence in the record of continuous communications by representatives of Fedders to retailers regarding the Sunbeam air conditioners. While it might be difficult to quantify any injury that resulted from Mr. Edwards's e-mail, there is no evidence that the task would be made less difficult by issuing an injunction at this point.

### CONCLUSION

For reasons discussed above, the plaintiff's motion for a preliminary injunction (Doc. 22) is **DENIED**. The counter-claimant's motion for a preliminary injunction (Doc. 16) is **DENIED**.

To clarify, this Court has not concluded at this stage of this litigation that the parties cannot prove their respective claims. Instead, the Court finds that the parties have not met the burden of establishing the right to preliminary injunctive relief by clear and convincing evidence.

**IT IS SO ORDERED.**